567 A.2d 160

**Albert P. WARNER**

v.

**TOWN OF OCEAN CITY.**

**No. 618, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

Dec. 26, 1989.

178

Leonard L. Lucchi (Wolman & Lucchi, on the brief), Upper Marlboro, for appellant.

Guy R. Ayres, III (Jerome James LaCorte and Ayres, Jenkins, Gordy & Almand, P.A., on the brief), Ocean City, for appellee.

Argued before KARWACKI, ROBERT M. BELL and CATHELL, JJ.

CATHELL, Judge.

Albert P. Warner, a member of the Ocean City Police Department, filed an appeal in the Circuit Court for Worcester County from the findings and decision of an

Administrative Hearing Board acting under the provisions of the Law Enforcement Officers Bill of Rights, which is codified at Maryland Code (1957, 1987 Repl.Vol.), Art. 27, § 727 et seq.

That agency rendered "verdict—guilty" on five charges.[1] These charges arose from Warner's communication of an anonymous letter to the Mayor and City Council of Ocean City, the text of which follows:

July 16, 1987

Mayor and City Council of Ocean City
301 Baltimore Avenue
Ocean City, MD 21842
Dear Mayor and city Council,

Recently, I read that Captain John Crone was promoted to Major and placed in charge of the Ocean City Police Department. As a concerned citizen of the Town of Ocean City, I wonder if the Police Department or the City Council does any type of background investigation on the people it chooses to promote to such important positions, or if the Mayor and Council even care about the person's character.

I have personal knowledge that Captain Crone has been involved in many types of unethical and illegal activities, to include:

1. Accompanying a juvenile to a bar to consume alcoholic beverages.

2. Holding his former wife hostage at gunpoint.

3. Giving prescription drugs to another officer on the police department.

4. Giving out confidential information to an individual who was suing the police department.

5. Having his Driver's License suspended in the State of Maryland.

---

**1.** There were five "verdict-guilty" findings. One or more of them may have been on sub-specifications of charges.

I would strongly suggest that the Mayor and City Council investigate this matter, and question the sergeants, lieutenants, and captains in regard to it. I also feel that an investigation by the Maryland Police Commission would be in the best interest of Ocean City and its citizens. If the Mayor and City Council are truly interested in a police department that is above reproach, then you will not hesitate to initiate a thorough investigation of Captain John Crone.

If an investigation is not initiated, then the above information will be forwarded to all newspapers and television media in the tri-state area.

Sincerely,

A Concerned Citizen

After reconvening under the provisions of Art. 27, § 731, the Board recommended that Warner be demoted from Lieutenant to Sergeant. That recommendation constituted a final decision under the provisions of Art. 27, § 731(d).

While there appears to be some confusion regarding whether the trial judge specifically affirmed or reversed the verdict as to "Specification 2 of Charge No. 1," the parties, on appeal, treat the trial court's opinion as affirming that finding. The trial court does conclude: "The decision of the Administrative Hearing Board be, and the same is hereby AFFIRMED, with the exceptions noted herein." Whereas there is no specific reversal or affirmance of Specification 2 of Charge 1, we will presume that the lower court affirmed the agency's finding and verdict on that charge. The two charges and verdicts so affirmed were:

1. Charge 1, Specification 2. Violation of Rule 1 which provides:

   Any breach of the peace, neglect of duty, misconduct or any conduct on the part of any member of the department, either within or without Ocean City, both on and off duty, which tends to undermine the good order, efficiency, or discipline of the department, or which reflects discredit upon the department or any member thereof, or which brings the department into disrepute,

even though these offenses may not be specifically set forth, shall be considered conduct unbecoming a member of the department and shall subject that member to disciplinary action.

Specification 2 for this violation:

On or about July 16, 1987, Lieutenant Albert P. Warner undermined the good order, efficiency and discipline of the department by violating the chain of command and circumventing the Chief of Police in sending a letter to the Mayor, the City Council and the City Manager, concerning an internal matter, without the knowledge of the chief.

2. Charge 3, Violation of Rule 1, Section 8, which provides:

Personnel shall not be insubordinate or disrespectful to a superior officer or other person designated to command, nor shall they willfully disobey any lawful command, regardless of whether it is verbal or written.

The specification for this violation:

On or about July 16, 1987, Lieutenant Warner acted in an insubordinate and disrespectful manner to Major John A. Crone and Chief Leroy E. Duggan by sending a letter containing allegations of misconduct by Major Crone to the Mayor, the City Council and the City Manager.

The trial court reversed all other findings of the agency. It did, however, affirm, without change or remand, the punishment meted out by the Board upon the appellant as to all five charges of which the Board had found appellant guilty. The appellant appealed. There is no cross appeal by appellee. On appeal we are presented with four questions:

1. Did the appellee demote the appellant because of his lawful exercise of constitutional rights?

2. Did the lower court err by relying [on] evidence not contained in the record of the hearing board? [If so, was such error harmful?]

3. Did the lower court err by affirming verdicts not based on substantial evidence?

4. Did the lower court, after reversing the hearing board on a majority of the charges, err by not remanding the case to the agency for further proceedings in light of the court's decision?

### 1, 3

▮ We first address the constitutional question appellant raises. In so doing, we will briefly review some of the cases concerning the balancing of the constitutional rights of employees with the legitimate interests of employers.

It has long been established that States may not discharge an employee for reasons which infringe on the employee's First Amendment rights to freedom of speech. *Perry v. Sinderman,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697–98, 33 L.Ed.2d 570 (1972). The Supreme Court recently reiterated this point in *Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987).

The Supreme Court, in *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), established a balancing test for determining whether an employee has been improperly sanctioned for exercising his or her constitutional right to freedom of expression. *Pickering* involved a public school teacher who was dismissed from his position for sending a letter to a local newspaper which criticized the Board of Education's actions concerning the raising of revenue for the schools. In determining the appropriateness of the discharge, the court had "to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* 88 S.Ct. at 1734–35. In reversing the teacher's dismissal, the Court determined that the subject matter of the statement and the manner in which it was made rendered it a matter of public concern. Since the Board was unable to substantiate allegations of detriment

to its functioning, or to the functioning of the school system, and since such statements could not "reasonably be regarded as *per se* detrimental to the district's schools," *id.* at 1736, the teacher's interest in making the statement substantially outweighed the State's interest in dismissing him.

Of particular importance to our application of the constitutional issues enunciated in *Pickering* to the case at bar, is the following footnote in Mr. Justice Marshall's opinion:

It is possible to conceive of some positions in public employment in which the need for confidentiality is so great that even completely correct public statements might furnish a permissible ground for dismissal. Likewise, positions in public employment in which the relationship between superior and subordinate is of such a personal and intimate nature that certain forms of public criticism of the superior by the subordinate would seriously undermine the effectiveness of the working relationship between them can also be imagined. We intimate no views as to how we would resolve any specific instances of such situations, but merely note that significantly different considerations would be involved in such cases.

*Id.* at 1735, footnote 3.

We believe that the police force in the case *sub judice* involves precisely the type of situation the Supreme Court contemplated in this footnote.

The entity involved in the case at hand is quasi-military in its structure and organization. It is founded on principles of discipline and rank, and the type of criticism at issue would per se undermine the relationship between Lieutenant Warner and his superiors. As a result, we must weigh additional and "significantly different considerations" from those noted in *Pickering*.

In deciding which additional considerations to weigh under the particular facts and circumstances of this case, we are aided by two recent Supreme Court cases, the first of

which is *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). That case involved a disgruntled Assistant District Attorney who, in response to a proposed transfer to a different department, drafted and distributed to other Assistant District Attorneys a questionnaire regarding, among other things, transfer policies within the office. Her superiors regarded this as a "mini-insurrection", and discharged her. She filed suit, contending that her employment had been wrongfully terminated because she had exercised her constitutional right to free speech.

Reversing the decisions of both the Federal District and Circuit Courts, the Supreme Court held that the attorney's discharge did not offend the First Amendment. In so holding, they applied an expanded version of the *Pickering* balancing test and determined that the employee's limited First Amendment interest was outweighed by the employer's interest in discharging the attorney where her conduct was disrupting the office, undermining the authority of her superiors and destroying close working relationships.

In reaching its decision, the Supreme Court had to conduct a "threshold inquiry" into whether the speech at issue related to a matter of public concern. In doing so, the Court considered "the content, form and context of the statement, as revealed by the whole record." *Connick, supra,* 103 S.Ct. at 1690. The portion of the questionnaire relating to office transfer procedures was held not to be a matter of public concern, but rather related to a personal employment dispute, and therefore was not protected. One question, however, asked whether any other employees had been coerced into working on particular political campaigns. This question did relate to a matter of public concern, and did contribute to her discharge.

The Court then had to consider whether the employer was justified in discharging the employee. "[T]he State's burden in justifying a particular discharge varies depending upon the *nature* of the employee's expression. Although such particularized balancing is difficult, the courts must reach the most appropriate possible balance of the compet-

ing interests." *Id.* at 1692. While the employee's conduct had not impaired her own ability to perform her duties, it clearly constituted an act of insubordination. Particular consideration was given to the time, place and manner in which the questionnaire was distributed. The employee had to put aside her own work to prepare the questionnaire, and others took time from work to read it and fill it out. This "support[ed] Connick's fears that the functioning of his office was endangered." *Id.* at 1693. The context of the distribution of the questionnaire is likewise significant, in that it immediately followed the receipt of the transfer notice.

> When employee speech concerning office policy arises from an employment dispute concerning the very application of that policy to the speaker, additional weight must be given to the supervisor's view that the employee has threatened the authority of the employer to run the office. *Id.* at 1693.

The Court concluded that the questionnaire regarded matters of public concern in a very limited manner.

> The limited First Amendment interest involved here does not require that Connick [the employer] tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships. *Id.* at 1694.

In applying the criteria set forth in *Connick*, it is important to note that in that decision, the Court reiterated the caveat first expressed in *Pickering:*

> "Because of the enormous variety of fact situations in which critical statements by ... public employees may be thought by their superiors ... to furnish grounds for dismissal, we do not deem it either appropriate or feasible to attempt to lay down a general standard against which all such statements may be judged."

*Connick v. Myers,* 103 S.Ct. at 1694. Therefore, while we look to the factors considered in *Connick* for guidance,

even these do not give us a complete framework within which to decide this case.

In *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987), which is an extension of the *Pickering* balancing test, the same caveat applies. While the factors considered in *Rankin* aid us in making our determination of the appropriateness of the sanctions in the case at hand, we are not limited to those considerations but must develop our own, taking into account the particularized facts of the case at hand.

*Rankin* represents one of that Court's most recent decisions on the competing interest of an employee's constitutional rights and the legitimate employment interest of a public employer. In *Rankin* the dispute arose when a clerical employee in a constable's office brought suit alleging that she was denied her First and Fourteenth Amendment rights when she was fired for making a political remark during a private conversation. In a 5–4 decision the employee prevailed.

McPherson, the employee who was discharged in *Rankin*, in a private conversation with another employee, commented on the shooting of President Reagan, saying, "... shoot, if they go for him again, I hope they get him." As a result of this statement, she was fired.

The Supreme Court's majority held that the speech was on a matter of public concern, that the statement did not amount to the advocating of a criminal act, and that the employer had not met its burden of demonstrating a state interest justifying her discharge that outweighed her First Amendment rights. The Court further held that although the statement was made at her work place, there was no evidence that it interfered with the efficiency of the office or that it brought public discredit to the office.

The majority in *Rankin* quoted *Pickering* as requiring

[A] balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promot-

ing the efficiency of the public services it performs through its employees. · [citations omitted]

*Rankin, supra,* 107 S.Ct. at 2896. The Court in *Rankin* stated, at 2898, that "[i]n performing the balancing, the statement will not be considered in a vacuum; the *manner, time, and place* of the employee's expression are relevant, as is *the context* in which the dispute arose." (emphasis added, citations omitted) In a detailed discussion of the *Pickering* balancing test, the Supreme Court stated:

We have previously recognized as pertinent considerations whether the statement impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.

These considerations ... make apparent that the state interest element ... focuses on the effective functioning of the public employer's enterprise.... [A]voiding such interference can be a strong state interest.

*    *    *    *    *    *

[I]n weighing the State's interest ... some attention must be paid to the responsibilities of the employee within the agency. The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails. Where, as here, an employee serves no *confidential, policymaking, or public contact* role, the danger to the agency's successful function ... is minimal.

107 S.Ct. at 2899–2900 (emphasis added). The majority concluded that "McPherson's employment-related interaction with the Constable was apparently negligible. Her duties were purely clerical and were limited solely to the civil process function.... There is no indication that she would ever be in a position to further—or indeed to have any involvement with—the minimal law enforcement activity engaged in by the constable's office." 107 S.Ct. at 2900.

Accepting without deciding, that the contents of Warner's letter are, at least on their face, an expression of public concern, we now make a comparative analysis of the facts in the case at bar with the facts and holding in *Rankin:*

(1) Place where the statement was uttered

| Rankin | Warner |
|---|---|
| In a private conversation with a co-employee. | In a written letter to the governing body of the town. |

(2) Time when it was uttered

| McPherson | Warner |
|---|---|
| After hearing a broadcast that the president had been shot. | After the subject of the statement had just been promoted to a job Warner had been seeking. |

(3) Manner of expression

| McPherson | Warner |
|---|---|
| In a brief conversation to one person in which McPherson almost as a digression—expressed a hope— | In a letter to the elected representatives of the people accusing a fellow supervisory officer of unethical and illegal acts, calling for an investigation and threatening public disclosure if Warner's demands were not met. |

(4) Context in which the expressions arose

| McPherson | Warner |
|---|---|
| A. The context has no significance.<br><br>B. McPherson "readily admitted the statement." | A. The context is very significant. It was written when Warner was competing with the subject of the letter for the job in question. It completely bypassed the chain of command and was addressed to the only authority that then may have been able to countermand the chief's decision.<br><br>B. Warner's letter was written anonymously to enable him to deny authorship. |

(5) Impairment of Discipline

| McPherson | Warner |
|---|---|
| None. | The manner of the uttering of the statement was, in and of itself, a breach of discipline. It cast aspersions on the ethics and honesty of a superior officer. |

(6) Creation of Disharmony

| McPherson | Warner |
|---|---|
| None. | Caused an immediate investigation to commence because of the anonymous nature of the comments. |

(7) Detrimental Impact on Close Working Relationships Requiring Personal Loyalty and Confidence

| McPherson | Warner |
|---|---|
| In a constable's office there is comparitively little investigatory work. | As a police officer in a full fledged law enforcement agency in which narcotic and other criminal investigations are continuously in progress, confidentiality and proper loyalty to the department are absolutely essential. As a Lieutenant, Warner would have access to such investigations and responsibility to supervise officers engaged in such activities. |

(8) Contact with the Public

| McPherson | Warner |
|---|---|
| No "public contact" role. | As a law enforcement officer he would have constant extensive public contact. |

(9) Duties

| McPherson | Warner |
|---|---|
| Purely clerical. | Supervisory, active enforcement of the criminal laws. |

(10) Reason for Action Taken

| McPherson | Warner |
|---|---|
| The content of her speech. | The manner in which the communication was made. |

As evidenced by this comparison, the facts in *Rankin v. McPherson* are the polar opposites of those in the case at bar.

A number of Maryland and Fourth Circuit cases also lend themselves to a comparison with the facts of the case at bar. *Beeler v. Behan*, 55 Md.App. 517, 464 A.2d 1091 (1983), involved a disciplinary hearing of a police officer arising out of that officer's inappropriate statements. He appealed to the Circuit Court for Baltimore County asserting that the rules and regulations of the department were overbroad and that, as applied to him, they unconstitutionally restricted his freedom of speech.

The facts indicated that the officer, in a hostile and aggressive manner, loudly criticized the department in a public place, asserting and insinuating that there was corruption in the department, i.e., that "the police should leave Mimi alone because he takes care of all of the Parkville Police." *Beeler* at 520, 464 A.2d 1091. During the investi-

gation he presented no evidence that his remarks were truthful.

In *Beeler* we stated at 522–23, 464 A.2d 1091:

Beeler's statements were directed not only toward superior officers but to fellow officers as well. The statements had an adverse effect on the harmony and relationship between Beeler and his fellow officers. In fact, the Hearing Board found "his comments were disruptive, demeaning and injurious to the reputation and morale of fellow members of the Baltimore County Police Department." This finding by the Board is entitled to considerable deference. Moreover, we query whether Beeler's unsubstantiated statements were knowingly and recklessly false, and thus outside the orbit of First Amendment protection.... [W]e conclude that the department's legitimate interest in discipline, *esprit de corps*, and efficiency outweighs the interest of Beeler to speak out on the matters in question. Accordingly, we conclude that the department regulations, as applied in this case, did not restrict any constitutionally protected conduct or speech.

These same factors are applicable in the case at bar. The comments are analogous and the interests to be protected are identical.

In *Berger v. Battaglia*, 779 F.2d 992 (4th Cir.1985), Berger, a police officer, performed in blackface while off duty, after he was ordered not to do so under a department rule prohibiting activity "that tends to reflect discredit upon himself or upon the Department." He challenged that order. The United States District Court for the District of Maryland entered judgment for the department. Berger appealed, and the U.S. Court of Appeals, 4th Circuit reversed. The Supreme Court denied certiorari.

The appellate court described the facts relevant to their decision to reverse as follows:

In none of his performances did Berger identify himself as a police officer; offer any comment on Department

policies or operations; make any reference to any other member of the Department; nor claim to be speaking for or in any way representing the Department....

He urged no conduct, incited no activity, made no derogatory or inflammatory remarks, advocated no lawlessness and sought no confrontation. 779 F.2d at 993.

The case at bar is factually distinguishable from *Berger v. Battaglia, supra.* Warner specifically commented on department policies and operations and his comments were directed toward another officer. He urged an investigation into his allegations and did so in a confrontational manner. As a result, *Berger v. Battaglia* offers no support for appellant's position on the constitutional issue.

Applying the test first set forth in *Pickering v. Board of Education, supra,* and later refined in *Connick v. Myers, supra,* and *Rankin v. McPherson, supra,* we hold that the action taken against the appellant in the case at bar was not an unconstitutional interference with the exercise of his First or Fourteenth Amendment rights. Furthermore, we think it significant that Lieutenant Warner, unlike the employees in the cases outlined above, had access to legitimate procedural mechanisms for airing his grievances. Had he utilized the appropriate channels, of which he admits he was aware, he could have brought Major Crone's alleged misconduct to light without exposing himself to the risk of disciplinary action. In this regard, we agree with Judge Eschenburg, the trial judge, who stated, in a well reasoned discussion on the constitutional aspects of this case: "It was not the contents of the letter that resulted in [Warner's] demotion, rather [it was] the means employed ... in the letter's publication and his admitted violation of ... Rules and Regulations." Warner's punishment resulted from "the place, means and unusual manner in which he chose to speak."

For the foregoing reasons, we perceive no error below on

the constitutional issues raised by appellant.[2]

██  We now address appellant's third issue. The evidence before the agency, if accepted as true, met the sufficiency standard to a degree that it eliminates any further need to review the evidence. (See our analysis of the facts contained in the preceding part of this opinion.)

We set out the general standard of review in administrative agency appeals in our case of *Comm'r v. Cason*, 34 Md.App. 487, 508, 368 A.2d 1067 (1977), as follows:

A reviewing court may, and should, examine any inference, drawn by an agency, of the existence of a fact not shown by direct proof, to see if that inference reasonably follows from other facts which are shown by direct proof. If it does, even though the agency might reasonably have drawn a different inference, the court has no power to disagree with the fact so inferred.

A reviewing court may, and should, examine any conclusion reached by an agency, to see whether reasoning minds could reasonably reach that conclusion from facts in the record before the agency, by direct proof, or by permissible inference. If the conclusion could be so reached, then it is based upon substantial evidence, and the court has no power to reject that conclusion.

A reviewing court may, and should, examine facts found by an agency, to see if there was evidence to support each fact found. If there was evidence of the fact in the record before the agency, no matter how conflicting, or how questionable the credibility of the source of the evidence, the court has no power *to substitute its assessment of credibility for that made by the agency, and by doing so, reject the fact.* [emphasis added].

We cited *Cason* in our recent decision in *Terranova v. Board of Trustees*, 81 Md.App. 1, 566 A.2d 497 (1989). In

---

**2.** In his brief, appellant additionally asserts that he should have been permitted to present and litigate the constitutional issue before the Board. We disagree. *See Landover Books, Inc. v. Prince George's County*, 81 Md.App. 54, 566 A.2d 792 (1989).

*Terranova* we discussed extensively the standard of review applicable to such administrative appeals. Under *any* standard, the evidence in the case at bar was sufficient to sustain the findings that the trial court affirmed. The trial court thus made no error in its review of the sufficiency of the evidence.[3]

2.

We shall now address appellant's contention that the lower court erred by relying on evidence not contained in the record of the hearing board. This claim of error is based on the trial judge's independent consideration of evidence which it solicited at the circuit court level.[4]

■ In *Maryland Retirement Systems v. Martin,* 75 Md.App. 240, 245–47, 540 A.2d 1188 (1988), we recently stated:

> Particularly relevant to the case *sub judice* is the rule that "in reviewing decisions of administrative agencies, the court's appraisal or evaluation must be of the agency's fact-finding results and not an independent original estimate of or decision on the evidence . . . ." Moreover, a reviewing court is restricted to the record made before the administrative agency, and is confined to whether, based upon the record, a reasoning mind reasonably could have reached the factual conclusion reached by the agency. . . .

*   *   *   *   *   *

We believe the trial judge violated the principles of judicial review which we have just restated. . . . Moreover, in order to substantiate its conclusions, the trial court engaged in independent fact-finding. This it may not do. Maryland Code (1984), § 10–215(f)(2) of the State Government Article provides in reference to the reviewing court

---

**3.** Again, we note no cross appeal was taken.

**4.** The trial court solicited and accepted documentary evidence that supported the oral testimony before the agency that the rules and regulations were adopted.

originating evidence that "[a] party may offer testimony *on alleged irregularities in procedure before the agency* that do not appear on the record." (emphasis added)

With that sole exception, the trial court's function regarding additional evidence on nonconstitutional issues, in cases such as the one at bar involving the rights of police officers under the LEOBR, is "to remand to an agency to consider additional evidence if the evidence is shown to be material and [if] good cause exists for why it was not presented at the time of the adjudicatory hearing before the agency." *Howard County v. Davidsonville Civic Ass'n*, 72 Md.App. 19, 47, 527 A.2d 772 (1987).

■ Thus we are constrained to conclude that it was error for the trial court, in such an administrative appeal, to solicit and accept new evidence instead of remanding the matter to the agency (if cause for such a remand existed).

■ Our inquiry, however, does not end there. We cannot reverse on that sole ground unless we determine that such error was prejudicial, i.e., constitutes harmful error. *Harris v. Harris*, 310 Md. 310, 319, 529 A.2d 356 (1987). In order to so determine we must examine whether there was any substantial evidence to sustain the agency's reliance on the validity of the rules and regulations, noting as we do so that legislative and administrative ordinances and resolutions enjoy a presumption of validity.

■ The facts in the case at hand which are relevant to our analysis are as follows: The individual rules and regulations the appellant was charged with violating were put in evidence before the agency. Additionally, the General Orders of the Department relevant to the case at bar were also put in evidence. Further, we observe from the trial judge's opinion that he found that "... Duggan (Chief of Police) himself testified the rules were approved and implemented by the [a]ppellee at a time when Duggan himself

was a member of the City Council." [5]

In the proceeding before the agency, the following occurred:

> Ayres [The Police Department Attorney]: This General Order and Rules & Regulations do you have personal knowledge that they were in fact approved by the Mayor & City Council of Ocean City?
>
> \* \* \* \* \* \*
>
> Duggan [Chief of Police]: Certainly [it's] a manner [sic] of record, it sticks well in my mind[.] I instituted the first large policy procedure that the City had and at that time at one of the Council sessions approved it, however, but it was not documented[.] [T]hat became a court case [6] and right after that and shortly after that I was a Council member and it's subject matter came up involving a case of Lt. Johnson and I remember right away what we did, is the rules and regulations .... [W]e all took it to pass it that it was policy and procedure of the Ocean City Police Department.
>
> Ayres: So you were actually a Councilman who voted and implemented it?
>
> Duggan: Yes I was.

The following transpired on cross-examination:

> Wolman [Appellant's agency counsel]: What's the dates?
>
> \* \* \* \* \* \*

---

5. In reviewing the transcript of the hearing before the agency contained in the record extract we have been unable to discover any sufficient table of contents to that transcript either within it or within the extract. Maryland Rule 8–501(h) provides in part that a table of contents "shall (1) reference the first page of the initial examination ... of each witness ...." The purpose of this rule is clear. It is to facilitate this Court's review of the testimony where necessary. We have reviewed that portion of the testimony before the agency to which the parties have referred by extract page numbers. We decline to flounder about in the extensive extract.

6. *Mayor and City Council v. Johnson,* 57 Md.App. 502, 470 A.2d 1308 (1984).

Duggan: You are asking me an impossible question for me to answer, there are so many of them. I have no idea what the dates are.

Wolman: I move to strike his testimony, Mr. Chairman he can't give us the dates.

Ayres: He doesn't have to give the dates.

Chairman: I don't feel that he has to give the dates.

The briefs refer us to no other testimony or evidence concerning the adoption or validity of the relevant rules and regulations. In his testimony, Chief Duggan alluded to the case of *Mayor and City Council v. Johnson, supra,* which appellant interprets to require an affirmative demonstration of validity. In the complete absence of any contradictory evidence, the evidence in the case at bar makes such a showing of validity. In any event, we agree with appellee that the holding in *Johnson* did not require an affirmative showing of rule validity as a necessary prerequisite to the maintenance of administrative disciplinary proceedings, where the issue was not first raised before the agency. In *Johnson,* the agency found that the rules and regulations "were not duly promulgated." The circuit court then sustained the Board's decisions. Such is not the situation in the case sub judice.

Regarding administrative regulations, 16A McQuillen, *Municipal Corporations,* § 45.07c. (3d Ed.1984), provides in part:

These regulations have the force and effect of law and must be construed by the same standards that govern the construction of statutes....

Generally, a board having authority to enact regulatory measures is vested with a large measure of discretion, and the burden of showing arbitrary action is upon the one by whom it is charged.

"Choice of organization, dress, and equipment for law enforcement personnel is a decision entitled to the *same sort of presumption of legislative validity* as are state choices designed to promote other aims within the cogni-

zance of the State's police power." [emphasis added, footnotes omitted]

The Court of Appeals in *Richards Furniture v. Board,* 233 Md. 249, 261, 196 A.2d 621 (1963), stated:

However, an act which has been duly authenticated and published as law ... bears a strong presumption that all constitutional provisions have been complied with, and it has been validly enacted into law; and this presumption continues to exist until the contrary is *clearly* made to appear. [citations omitted, emphasis in original]

In *Panitz v. Comptroller,* 247 Md. 501, 516, 232 A.2d 891 (1967), while ruling that a statute was invalid, the Court of Appeals nevertheless recognized the presumption of validity when it said: "In holding on June 14 last that Ch. 142 was prima facie valid as legislation we gave recognition to the general presumption in favor of the validity of a statute."

In the present case the rules and regulations are entitled to the same presumption of validity as are statutes. Additionally, there was affirmative evidence that they were adopted. More importantly, there was absolutely no evidence to the contrary.

Accordingly, there was sufficient evidence before the agency for that agency to accept the validity of the rules, and for the trial court to sustain the agency's findings on that record. The trial court's erroneous attempt to add "icing to the cake" does not sufficiently vitiate the Board's finding and the trial court's affirmance. There was ample unobjectionable evidence to support both decisions. Thus, the error was harmless. *Harris, supra.*

4.

█ In the original hearing before the agency, the Board did not impose separate punishments or disciplinary remedies as to each infraction found, but imposed a general penalty as to all infractions. While reversing the Board on half of its "guilty" findings, the trial court affirmed all of its punishment.

■ Appellee argues that the agency sanction "was not imposed because of the number of infractions ... but rather because of the seriousness of the deed itself." While this argument, at first glance, appears persuasive, that appearance is deceiving. In making this argument, appellee asks this Court (as it apparently persuaded the trial court) to substitute its judgment as to sanctions for that of the agency. The Board, in its imposition of sanctions, clearly indicated that the charges were one of the primary determinative factors in the imposition of sanctions. It said:

> After thorough considerations on [sic] your personnel folder, *and considering [sic] the charges you were found guilty of,* it is the determination of this board that Lt. Warner be demoted to the rank of Sergeant. [emphasis added]

While the Board might well impose the same sanctions for two violations as it did for five violations, that decision belongs to the Board, not to us, and not to the trial court. The Board's wording in imposing the sanctions indicates that it based the decision on the nature of all of the charges. Since the trial court reversed the Board's findings as to a substantial portion of the charges, the sanction imposed must be reconsidered. Accordingly, we shall remand to the trial court with instructions to that court to remand it to the Board for reconsideration of the sanctions. In so ordering, we make no suggestion with respect to the sanctions which the Board should impose. We hold only that, where a trial judge has reversed one or more of an agency's findings of guilt, it is the agency that must determine whether the reversal merits a different sanction.

■ Appellant also submitted that, in any event, the trial court should have reversed appellant's punishment because "it [sic] so disproportionate to the offense, in light of all circumstances, as to be shocking to one's sense of fairness." While the sanction imposed may or may not be the most appropriate sanction, and while it may or may not be

modified on remand, in our review of the record, the sanction imposed has not shocked our sense of fairness.[7]

JUDGMENT AS TO THE TRIAL COURT'S RULINGS ON THE CHARGES AFFIRMED; JUDGMENT AS TO THE TRIAL COURT'S AFFIRMANCE OF SANCTIONS REVERSED; ON OUR REMAND THE TRIAL COURT IS TO REMAND TO THE AGENCY WITH INSTRUCTIONS TO THE AGENCY TO RECONSIDER SANCTIONS IN LIGHT OF THE TRIAL COURT'S RULING AND OUR HOLDING; APPELLANT TO PAY 80% OF THE COSTS; APPELLEE TO PAY 20%.

---

7. Lieutenant Warner's misconduct resulted only in a demotion, not in dismissal, as occurred in the Supreme Court cases outlined in this opinion.