**Regina MEKSS, Appellant (Petitioner),**

v.

**WYOMING GIRLS' SCHOOL, STATE of WYOMING, Appellee (Respondent).**

No. 89–235.

Supreme Court of Wyoming.

June 12, 1991.

Rehearing Denied July 24, 1991.

Jane A. Villemez, Graves, Santini & Villemez, P.C., Cheyenne, and Stephen L. Pevar, American Civil Liberties Union, Denver, Colo., for appellant.

Joseph B. Meyer, Atty. Gen., John W. Renneisen, Deputy Atty. Gen., Karen A. Byrne, Sr. Asst. Atty. Gen., for appellee.

Before URBIGKIT, C.J., and
THOMAS, CARDINE, MACY and
GOLDEN, JJ.

THOMAS, Justice.

This appeal involves the delicate balance between a governmental employee's right of free speech and the authority of government officials to manage their offices. The court must decide whether the appellant, Regina Mekss (Mekss), was discharged unlawfully from her position as a bookkeeper at the Wyoming Girls' School (School) be-

cause of the exercise of her right of free speech, or whether she was discharged lawfully for conduct that was not protected. After she was discharged by the School, Mekss appealed to the Personnel Review Board. The Personnel Review Board approved the discharge as lawful, but it ordered that Mekss be paid her salary and benefits for five months, a period that coincides with the time during which the review was pending. Mekss then appealed to the district court, and the School filed a cross-appeal. The district court affirmed the action of the Personnel Review Board with respect to the discharge, but reversed the award of five months pay and benefit. In her appeal to this court, Mekss seeks reversal so that she will be reinstated and also will receive the back pay. We affirm the order of the district court with respect to the affirmance of the action of the Personnel Review Board in approving the discharge. We reverse that portion of the order of the district court that reversed the award of back pay on the ground that the district court had no jurisdiction because the School had no right to take its cross-appeal from the decision of the Personnel Review Board.

In her Brief of Appellant, Mekss states these issues:

"1. Whether a public employee has the right to speak, without reprisal upon a matter of public concern to the government agency empowered to investigate and resolve the subject of that concern.

"2. Whether Wyoming Girls' School violated Wyoming Personnel Rules in terminating Regina Mekss' employment when it did not follow the successive steps of discipline required by the Rules.

"3. Whether the Wyoming Girls' School lacked standing under the Wyoming Administrative Procedures Act to appeal the decision of the Personnel Review Board, which awarded Regina Mekss five months back pay."

The School, in its Brief of Appellee, sets forth the issues in this way:

"I. Whether a state employee can be dismissed from employment for circumventing established lines of authority and refusing to accept the disciplinary measures imposed?

"II. Whether the Wyoming Girls' School followed the procedures of the Wyoming Personnel Rules in terminating appellant?

"III. Whether the Wyoming Girls' School had standing as a party to cross-petition the decision of the personnel review board?"

The Wyoming Girls' School is the state institution created by statute to provide educational, vocational, and rehabilitative services to adolescent girls committed by the state's district courts. Sections 25–4–101 to –103, W.S.1977. It is one of the state charitable, reformatory, and penal institutions described in Wyo. Const. art. 7, § 18, which establishes the general supervision of the Board of Charities and Reform over such institutions. The governor, the secretary of state, the state treasurer, the state auditor, and the state superintendent of public instruction compose the Board of Charities and Reform (Board). Section 25–1–101, W.S.1977. The Board then appoints an executive secretary who is responsible for evaluating and reporting the condition of all institutions under the Board's control. Section 25–1–103(a) and (b)(ii), W.S. 1977. The executive secretary coordinates the activities of the Board and assists in the general supervision of operation of the state's correctional, mental health, nursing home and children's institutions. The direct supervision of the day to day operations of the School are the responsibility of a superintendent who also is appointed by the Board. Section 25–1–201(b)(i) and (c), W.S.1977. The superintendent, Jack Geisler (Geisler), was charged with primary authority to employ and assign all personnel necessary to manage and carry out the mission of the school. Section 25–1–201(c), W.S.1977.

Mekss initially was employed at the school in 1984 as a night dormitory attendant. In 1985, she was transferred to the business office where she worked as a bookkeeper. This assignment permitted Mekss to utilize her training and her degree in accounting. Her employment eval-

uations indicate that her job performance in that position was in the competent to outstanding range. Mekss held this book-keeping position until her dismissal in December of 1988. Because of the significance of this case and the very fine balance to be drawn, a detailed chronology of the events leading to her discharge is appropriate.

Beginning in 1987, the School experienced some problems with a few employees, particularly those who worked on the night shift. Those problems included employee dissatisfaction, intimidation of newer employees, and disregard for school policies. In March of 1988, Geisler became aware that a group of employees had held a meeting off campus to discuss concerns about conditions at the School. Geisler then issued a memorandum that invited members of the staff to come and discuss their concerns with him or with Assistant Superintendent Gary Kopsa (Kopsa).

Through the spring and summer of 1988, the problems continued and, on June 25, 1988, two employees sent an anonymous letter to K. Gary Sherman (Sherman), Executive Secretary of the Board of Charities and Reform. That letter set forth in detail concerns about staff morale, discriminatory promotion practices, the use of corporal punishment, and criticism of management at the school. Sherman advised Geisler about this letter and requested Geisler to submit a response. On July 26, Geisler sent his response to the Board, and copies were circulated among all employees at the School. Sherman found Geisler's response to be a satisfactory explanation of conditions at the School and an exoneration of any wrongdoing on the part of management.

After that, the Board received several more anonymous letters that included one written by Mekss on August 12, 1988. Statements in the anonymous letter authored by Mekss that are relevant to this proceeding include the following:

"There are grave problems in administration here at the Wyoming Girls' School which are growing progressively worse and which are very negatively affecting the morale and performance ability of the staff and, ultimately, quality of service rendered by this agency.

\*      \*      \*      \*      \*      \*

"There is a vast difference between executive prerogative in favoring those who one perceives as hard-working (as Mr. Geisler states in his letter) and outright harassment of those who question, express a difference of perception, or offer suggestions (which is what Mr. Geisler actually does). I reiterate that many staff members would reinforce stated concerns and add many more if they were not totally intimidated. But precedents already exist of Girls' School employees who have been relentlessly harassed into submission, some even to the point of (early) retirement.

\*      \*      \*      \*      \*      \*

"None of us cares for the unpleasantness of the situation nor for dealing with the problems via anonymous letters. I, myself, have had moments of delusion almost yearning to go to Jack Geisler offering a proposal of what the problem might be and possible suggestions so that this entire mess could be cleared up simply, quickly, finally, but one has only to sit through one or two uncensored staff meetings (a stinted event in the words of one teacher), attempt to resolve a problem in a supervisors' meeting (and we are talking very non-threatening language here), or be involved in some crisis before it becomes undeniably crystal clear that Jack Geisler will listen to the input of only a select few 'fair haired boys' and members of the 'Boys' Club' without question and that he consistently will not even allow for presentation of another point of view or the other side of the story. \* \* \* It seems that Mr. Geisler thinks there is no need for correction or room for improvement in this position *ever*! (Emphasis in original.)

\*      \*      \*      \*      \*      \*

"It is not appropriate to have an administrator incapable of offering feedback to or correcting staff in a dignified manner.

\*      \*      \*      \*      \*      \*

"Even favored members of the "Boys' Club" have questioned Jack's judgment in several instances. I think most staff members would agree that the man has lost his objectivity, that perhaps he has grown tired or lazy after all these years, that he looks for the easy way out, that we are working with tools from the Dark Ages.

\* \* \* \* \* \*

"I do not know how these problems could have been dealt with in any other fashion in the current system. The grievance process is not workable in this situation. What subordinate can ever go to a boss and tell them they are making a mistake and especially in this situation where Mr. Geisler has made it abundantly clear that he does not take suggestions well, even those couched in the most non-threatening language?"

Sherman and the Board then concluded that it would be necessary to have an investigation at the School to verify the existence of any of the alleged improprieties. The corrections administrator for the state, who was Geisler's immediate supervisor, and the warden at the Women's Center were assigned to conduct a two-day investigation. That investigation was conducted on August 24 and 25, 1988, and each employee at the School was allocated fifteen minutes to meet individually with the investigators and present any concerns.

The results of the confidential investigation were summarized in a letter from Sherman to Geisler dated August 26, 1988. In part, that letter advised Geisler:

"As you know you have been the target of several anonymous letters sent to the five elected officials and myself.

"To settle the issues raised by the allegations in those letters, I asked \* \* \* [the] corrections administrator, and \* \* \* [the] Warden of the Wyoming Women's Center to conduct a confidential interview with each employee at the Wyoming Girls' School.

"The results of this investigation indicate the following:

". You have the overwhelming support of your staff.

". Your staff to a person believe that this program is beneficial to the girls it serves.

". *No one* admitted writing the anonymous letters. (Emphasis in original.)

". No one demonstrated any proof of the anonymous allegations. There were six (6) employees who expressed universal dissatisfaction.""

Sherman's conclusion was that "the allegations were spurious, mean spirited and without substance." As a product of the investigation, however, several changes were made in schedules for the night shift staff. Sherman did request that Geisler post copies of his letter so that the staff of the School would be aware of the results of the investigation.

On September 9, 1988, a scheduled staff meeting was held for all of the employees at the School, and Mekss attended that meeting. At the meeting, Geisler presented a speech that he had prepared emphasizing the mission of the School, the importance of honesty, harmony, trust, and mutual respect among employees, and he reminded everyone of his memorandum dated in March that invited the staff to discuss their ideas and concerns with him.

In the month of November, the Board met at the School, pursuant to the statutory duty of the Board to make personal inspections of all state institutions at least once every year. Section 25–1–104(b), W.S. 1977. During the course of this visit, Secretary of State Kathy Karpan met with Mekss and several other disgruntled employees. At that meeting, the employees expressed concern that the investigation had not been fair and complete and that the results were inaccurate. Karpan's response to their concerns was the suggestion that the employees contact Sherman about their complaints. On November 23, 1988, Mekss, apparently following up that suggestion, attempted to call Sherman to discuss the investigation. Sherman was not able to talk with Mekss when she called, but he asked the corrections administrator to return her call. When he called, Mekss refused to discuss her concerns with the corrections administrator since he had

conducted the investigation that she was calling to complain about. After their conversation, the corrections administrator called Geisler to inform him of Mekss' call to Sherman and the return of that call to Mekss.

On November 30, 1988, Mekss, Geisler, Kopsa, and Mekss' immediate supervisor in the business office met to discuss the Mekss telephone conversation with the corrections administrator. Mekss was asked if she had tried to call Sherman about a school matter, and her reply was that her call did not concern school matters. After the meeting, Mekss and the other participants signed a memorandum, prepared by Geisler's secretary that memorialized the essence of the meeting. The concluding statement was:

> "Jack Geisler stated that if there were concerns about the Girls' School, that they should **FIRST** be expressed to * * * [Mekss' immediate supervisor], Gary Kopsa or himself. Regina stated that she had, in fact, stated her concerns through the proper channels." (Emphasis in original.)

After that meeting, but also on November 30, 1988, Mekss did succeed in contacting Sherman to discuss her concerns about the investigation.[1] In the course of that telephone conversation, Mekss, for the first time, disclosed to Sherman that she had written one of the anonymous letters. At some point in that conversation, Sherman told Mekss that she was at risk for violating the chain of command and that he intended to inform Geisler of her call.[2] The next day, Sherman did telephone Geisler to inform him of the conversation with Mekss.

On December 5, 1988, Geisler and Mekss met to discuss the most recent telephone call from Mekss to Sherman. Geisler again asked Mekss about her concerns with respect to the School. There is a discrepancy as to Geisler's and Mekss' several perceptions of her response. Geisler said that Mekss told him only that she wished to make things better and that her call to Sherman had to do with the investigation. In her testimony, Mekss stated that she told Geisler about her concerns with staff morale and that he was receptive to this information. In any event, Geisler advised Mekss that she would be disciplined for insubordination. He presented Mekss with three options: (1) she would resign from her position; (2) she would accept a two-week suspension and write a letter of apology addressed to those people who had received and who had been affected by her anonymous letter; or (3) she would be dismissed. Mekss elected to pursue the second option, and she wrote a letter of apology that she submitted to Geisler the same day. The letter of apology drafted by Mekss was addressed to the governor, Sherman, the other members of the Board of Charities and Reform, and the School staff, and it said:

> "I am the writer of one of five anonymous letters by as many different authors written to the Board about the Girls' School last summer. My intention in writing was to convey problems which I had experienced personally, been witness to, and about which many Girls' School staff had shared common concern or frustration.
>
> "I am sorry:
>
> "1). that things came to such a sorry state of affairs that I felt I could not in good conscience let go unchallenged, 2). that I thought I could do anything to help fix it, 3). for any personal suffering Jack Geisler might have experienced in this, 4). that Girls' School staff members

---

1. There is a discrepancy in the record as to whether Mekss called Sherman the same day, November 30, or the following day, December 1. Hearing Exhibit A–13, consisting of Geisler's notes of a December 1, 1988 phone call from Sherman indicate that Mekss called Sherman on the evening of November 30. Mekss testified that she called Sherman the following day, December 1. Regardless of whether the call was made on November 30 or December 1, the fact that the call occurred shortly after Mekss' November 30 meeting with Geisler is significant.

2. Sherman insisted in his hearing testimony that he informed Mekss of her "risk" in violating the chain-of-command at the very outset of their conversation. Mekss testified that the warning came much later in the hour-long conversation.

as a whole might have experienced intensified upheaval;

"but,

"1). I saw no other avenues, and 2). I know that the upheaval had already been affecting us for at least several years and that it still appears to be with us.

"It was never my hope to see Jack's 'head roll' or that he be publicly smeared. My only hope was that the Board, being in a position to do so, would seek comprehensive information and make quiet improvement or correction through objective adjustment. I think that it would be safe to say the same about the other writers as well.

"I still do not, to this day, believe that I could have approached this situation from within this agency without reprisal and I challenge the conclusion of this summer's investigation that no allegations were found to be substantiated because it directly contradicts information which I know I presented.

"I acknowledge that the tone of my letter was nasty in a few places—and for this I apologize—but still assert that its substance was true."

The following day, Geisler returned the letter advising Mekss that it was not an acceptable apology.

On December 7, 1988, Geisler and Mekss met one more time to discuss her letter of apology and the status of her disciplinary options. They were unable to resolve their differences, and Mekss indicated that dismissal seemed to be the only alternative. Geisler then wrote Mekss a letter of notification of dismissal and suspended her with pay for ten working days. On December 21, 1988, Geisler advised Mekss' attorney of her dismissal effective upon that date.

The notice of termination that was furnished to Mekss listed two reasons for her dismissal. They were (1) attempts to endanger the peace and safety of others by writing unsubstantiated accusations that are disruptive to the good of the service; and (2) insubordination by circumventing established lines of authority while refusing attempts to counsel and refusal to accept disciplinary measures imposed. The misconduct set forth as the grounds for Mekss' dismissal in Geisler's December 7, 1988 notice of intention for dismissal were "circumventing established lines of authority and refusing to accept disciplinary measures imposed." In responding to Mekss' petition for review before the Personnel Review Board, the School gave these two reasons for dismissal:

"(a) circumventing established lines of authority.

"(b) refusing to accept disciplinary measures imposed."

In testifying about the first reason for dismissal in the December 21 notice of termination, Geisler said that "attempts to endanger the peace and safety of others by writing unsubstantiated accusations that are disruptive to the good of the service" was inserted at the suggestion of the Wyoming Attorney General's office. That ground was not something Geisler was concerned with when he wrote the December 7 letter of notification of dismissal. Geisler also testified that Mekss' telephone call to Sherman shortly after the November 30, 1988 meeting between himself and Mekss circumvented established lines of authority and was the specific event that justified dismissal. Geisler further stated that, in his view, Mekss' failure to provide an acceptable letter of apology constituted refusal to accept "disciplinary measures imposed."

Mekss then requested a hearing before a "personnel review board," pursuant to the Wyoming Administrative Procedure Act, § 16-3-101 to -115, W.S.1977. Such personnel appeal hearings for state employees are conducted by a three-member personnel review board panel pursuant to § 9-2-1019(a), W.S.1977. The personnel review board, by definition, is an "agency" within the Department of Administration and Fiscal Control (§ 9-2-1002(a)(i), W.S. 1977), and, consequently, such proceedings must be conducted in accordance with the Wyoming Administrative Procedure Act. The request for a hearing before a personnel review board was granted by the School, and the two-day hearing was held in May, 1989. After the hearing, the Per-

sonnel Review Board filed its decision with the personnel division of the Department of Administration and Fiscal Control.

The findings of fact and conclusions of law made by the Personnel Review Board are:

"Findings of fact:

"1. Ms. Mekss had a good to excellent work record as a Fiscal Control Technician. She appeared to have good rapport with and be liked by her fellow workers.

"2. Ms. Mekss was apparently self-appointed to call attention to the issues set forth in the anonymous letters, one of which she authored.

"3. Ms. Mekss failed to exhaust the normal personnel system options by taking issues directly to Mr. Geisler prior to proceeding in the manner in which she did.

"4. Ms. Mekss should have immediately ended the 11/30/88 telephone conversation with Mr. K. Gary Sherman once she was advised she was at risk in pursuing the issues as she was, even though that avenue had initially been invited by Ms. Kathy Karpan.

"5. Mr. Geisler applied some sort of discipline in some manner to Ms. Mekss between March and December, 1988.

"6. Both Ms. Mekss and Mr. Geisler failed to allow the issues to be aired directly and failed to weigh the full consequence of their actions. Both parties at times acted hastily and improperly and directly contributed to the dismissal.

"Conclusions:

"1. Ms. Mekss created disharmony in the function of the Wyoming Girls' School and circumvented established lines of authority.

"2. Mr. Geisler did not fully comply with the DAFC Personnel Rules and Regulations in his application by consistent, well-defined, and progressive disciplinary measures prior to his dismissal of Ms. Mekss.

"3. Ms. Mekss' request for reinstatement as Fiscal Control Technician is denied as not being in the best interests of either party or the overall functioning of the Wyoming Girls' School.

"4. The Wyoming Girls' School should remunerate Ms. Mekss five (5) months salary (and associated benefits). The remuneration should be based upon Ms. Mekss' salary at the time of her dismissal. This compensation should constitute full and complete settlement.

"5. Mr. Geisler and Ms. Mekss should accept the above Conclusions, refrain from further actions related to these Conclusions and allow the dedicated and competent staff of the Wyoming Girls' School to concentrate on activities which are of direct service to the School's residents and which are in direct fulfillment of the mission of the Wyoming Girls' School."

Even though the Personnel Review Board ruled against Mekss' request for reinstatement, the Board did decide that Mekss was entitled to receive five months back pay and associated benefits.

Mekss petitioned the district court for review of the Board's decision pursuant to § 16-3-114, W.S.1977. In addition to asserting the erroneous nature of the Board's decision, Mekss also asserted that the decision failed to set forth specifically detailed findings of fact to support the ultimate facts and the Board's conclusions of law. The School in turn sought review of the award of the five months back pay asserting that the award was arbitrary, capricious, an abuse of discretion, in excess of the Board's statutory authority, and unsupported by substantial evidence. The district court heard arguments, reviewed the record, and entered an order affirming Mekss's termination, but reversed the decision of the Personnel Review Board to remunerate Mekss' with five months back pay and benefits. Mekss then appealed to this court.

The primary focus of Mekss' appeal is whether her dismissal constituted an infringement of her "constitutionally protected interest in freedom of expression." *Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983). The First Amendment to the Constitution of the United States guarantees freedom of speech to all citizens as a fundamental

right.[3] This constitutional limit upon restricting free speech is applied to state agencies and state officials by virtue of the "privileges or immunities" clause of the Fourteenth Amendment to the Constitution of the United States.[4] Article 1, Section 20, of the Constitution of the State of Wyoming also guarantees to every person the right of freedom of speech.[5] In *Cheyenne Airport Board v. Rogers*, 707 P.2d 717, 726 (Wyo.1985), *appeal dismissed* 476 U.S. 1110, 106 S.Ct. 1961, 90 L.Ed.2d 647 (1986), this court, citing *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980), recognized the principle that:

> "State constitutions may add to [United States constitutional] limitations and may be more protective of individual liberties. They may not, however, under the dictates of supremacy, be less protective."

The constitutional right of free speech, however, is not an absolute right. *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15, *reh. denied* 417 U.S. 977, 94 S.Ct. 3187, 41 L.Ed.2d 1148 (1974); *Allen v. Safeway Stores, Inc.*, 699 P.2d 277, 283 (Wyo.1985).

■ We turn first to the constitutional claims asserted by Mekss. It is our duty to review the *action of the Board* and, if it is found to be contrary to a constitutional right, we must set aside the Board's decision. Section 16–3–114(c)(ii)(B), W.S.1977. The Personnel Review Board heard testimony, received evidence, and was briefed

by counsel from both sides on the constitutional issues present in the case.[6] The Board, of course, was foreclosed from a determination as to the constitutionality of the dismissal by the School. *See Belco Petroleum Corp. v. State Board of Equalization*, 587 P.2d 204 (Wyo.1978). Essentially, its review was limited to a determination as to the sufficiency of the evidence to justify the discharge by the School. The circumstances of this case demonstrate the wisdom of the rule because this Board consisted of non-attorneys who were acting without the benefit of legal counsel. It, indeed, would be hazardous to afford to such a body the authority to decide sensitive questions of constitutional law, which this question indeed is.

The Supreme Court of the United States has discussed the role of an appellate court in reviewing a determination of first amendment issues by a trial court and said:

> " ' * * * [W]e are compelled to examine for ourselves the statements in issue and the circumstances under which they are made to see whether or not they * * * are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect.' " *Connick*, 461 U.S. 138, 150, n., 103 S.Ct. 1684, 1691, n., quoting *Pennekamp v. Florida*, 328 U.S. 331, 335, 66 S.Ct. 1029, 1031, 90 L.Ed. 1295 (1946).

> "Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right; and in all trials for libel, both civil and criminal, the truth, when published with good intent and [for] justifiable ends, shall be a sufficient defense, the jury having the right to determine the facts and the law, under direction of the court."

---

**3.** The First Amendment to the Constitution of the United States provides, in pertinent part: "Congress shall make no law * * * abridging the freedom of speech. * * *."

**4.** The Fourteenth Amendment to the Constitution of the United States provides: "All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

**5.** Article 1, § 20, of the Constitution of the State of Wyoming reads:

**6.** In opening statements to the Personnel Review Board, both counsel framed the basis for Mekss' dismissal in terms of protected or unprotected speech. Counsel indicated that the Board would be instructed on the constitutional issues and law during closing arguments after it had heard the evidence. At the end of the hearing, however, both sides waived their opportunity to make closing arguments to the Board.

The following year, the Supreme Court of the United States supplemented this concept in this way:

" * * * [I]n cases raising First Amendment issues we have repeatedly held that an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure 'that the judgment does not constitute a forbidden intrusion on the field of free expression.' *New York Times Co. v. Sullivan*, 376 U.S. [254], at 284–286, 84 S.Ct. [710], at 728–729 [11 L.Ed.2d 686 (1964)]." *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984).

We accept these principles as applicable to our review of the action of the Personnel Review Board.

■ Mekss relies upon a series of cases from the Supreme Court of the United States that address a public employee's right of free speech. In the course of these cases, a sequential test has been developed and refined to assist in the determination as to whether a public employer has impermissibly infringed upon the constitutional right to free expression enjoyed by an employee. Recently, that test was summarized in *Schalk v. Gallemore*, 906 F.2d 491, 494–95 (10th Cir.1990):

"First, the court must decide whether the speech at issue touches on a matter of public concern. *Connick*, 461 U.S. at 146, 103 S.Ct. at 1689; *Melton* [*v. City of Oklahoma City*], 879 F.2d [706] at 713 [(10th Cir.1989)]. If it does, the court must balance the interest of the employee in making the statement against the employer's interest 'in promoting the efficiency of the public services it performs through its employees.' *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1735, 20 L.Ed.2d 811 (1968). Third, if the preceding prerequisites are met, the speech is protected, and plaintiff must show her expression was a motivating factor in the detrimental employment decision. *Mount Healthy City School Dist. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). Finally, if the plaintiff sustains this burden, the employer can still prevail if it shows by a preponderance of the evidence that it would have made the same decision regardless of the protected speech."

We are satisfied that this sequential test is useful to us in deciding whether Mekss' constitutionally protected right of free speech was infringed by her dismissal from employment at the school.

Before applying the sequential test, we differentiate between two separate, but related, instances of expression by Mekss. The first is found in the anonymous letter written to the Governor and other members of the Board. That letter set forth Mekss' perception of conditions at the School with regard to alleged mismanagement, poor morale, discriminatory employment practices, and improper use of corporal punishment. That letter was instrumental in convincing the Board to conduct an investigation at the School. After that investigation was completed and the results released, a second communication was initiated by Mekss. She contacted the executive secretary of the Board and expressed her dissatisfaction with the results of the investigation. It was following her complaints to Sherman that Mekss was dismissed for insubordination. The charge of insubordination was based upon Mekss' circumvention of established lines of authority and her failure to comply with disciplinary measures imposed by Geisler.

Mekss has argued that both the letter and the telephone calls constituted protected free speech. She contends that, as a "whistle blower," she is entitled to the highest level of constitutional protection. We have reviewed this record in detail as well as the cases relating to the constitutional principles, and we conclude that these two instances of expression are different and justify separate analysis.

■ We agree with, and accept, Mekss' contention that she was "blowing the whistle" when she directed her anonymous letter to the Board of Charities and Reform. "When balancing the rights of the employee against those of the employer, an employee's First Amendment interest is

entitled to greater weight where he is acting as a whistle blower in exposing government corruption. *See Foster v. Ripley,* 645 F.2d 1142, 1149 (D.C.Cir. 1981). Speech that seeks to expose improper operations of the government or questions the integrity of governmental officials clearly concerns vital public interests." *Conaway v. Smith,* 853 F.2d 789, 797 (10th Cir.1988).

It would overstate the matter to suggest that Mekss was "exposing government corruption" *per se,* but she was attempting to draw attention to "improper operations" at the School. We conclude that the anonymous letter should be afforded the highest level of constitutional protection in accordance with the applicable principles of law.

■ Continuing to address the anonymous letter, we, for purposes of this opinion, assume, without deciding and only for the purpose of this opinion, that Mekss' letter deals with a matter of public concern and that her interest in making the statement outweighs the interest of the School in preventing the statement. This brings us to the third step in the constitutional analysis. At this juncture, Mekss must accept the burden of establishing that her letter was a "substantial or motivating factor" in her dismissal. *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Geisler testified, on cross-examination, that he dismissed Mekss not for writing the anonymous letter, but rather for her telephone calls to Sherman and for her subsequent refusal to comply with disciplinary proceedings. We quote from the cross-examination of Geisler by Mekss' attorney at the hearing:

"Q. Excuse me. Let me clear that up. Would you tell us the precise reason why Regina Mekss was dismissed?

"A. For circumventing lines of authority, for ignoring agency guidelines, for refusing to accept counsel and discipline.

"Q. And, sir, the circumventing established lines of authority, that would be the telephone call to Gary Sherman, correct? That's the specific act?

"A. Yes.

"Q. The phone call around December 1st, to give it a date?

"A. After we had had our first talk.

\* \* \* \* \* \*

"Q. \* \* \* And the refusal to accept disciplinary measures imposed, \* \* \* that's her failure to give you the correct letter of apology, to put it in a nutshell; isn't it?

"A. Yes.

"Q. And you have nothing else to add to those two points; do you?

"A. No.

"Q. And, sir, the charge of circumventing established lines of authority is based upon your perception that she should have brought concerns that she had through proper channels; is that correct?

"A. Yes, yes.

"Q. And because, in your perception, she did not, she was fired? Is that correct?

"A. Yes.

"[Counsel]: That's all the questions I have of Mr. Geisler."

There is no evidence in the record to refute Geisler's testimony.

The reason stated in the notice of dismissal and an analysis of the findings and conclusions of the Personnel Review Board persuade us that Mekss was not dismissed for writing an anonymous letter. Mekss vigorously argues for a contrary inference, but that contrary inference was not adopted by the finder of fact, the Personnel Review Board. Since no other evidence was presented that refutes Geisler's testimony, Mekss failed to satisfy her burden under *Mt. Healthy.*

If we assume, for the sake of argument, that the anonymous letter was one of several factors contributing to Mekss' dismissal, the factually similar case of *Warner v. Town of Ocean City,* 81 Md.App. 176, 567 A.2d 160 (1989), becomes pertinent. Warner, an Ocean City police officer, wrote an anonymous letter to the mayor and city council urging an investigation of the newly appointed police captain's alleged unethical and illegal activities. After Warner's identity was disclosed, an administrative

hearing board made findings of fact and determined that Warner was "guilty" of insubordination. Upon review of the administrative proceeding, the lower court reversed all but two of the five "charges" against the officer, but it did affirm the board's determination that the officer had been insubordinate. The issues on appeal to the appellate court were substantially similar to those in this case.

In *Warner*, the appellate court addressed the constitutional question under the four-step test set forth above. The court noted that the issue had not been litigated before the administrative board and, like this case, that issue was decided for the first time on appeal. The court recognized the considerable importance of discipline, harmony, and loyalty in a law enforcement organization, and it concluded that Warner's right to free speech had not been violated. The language of the Maryland court is especially instructive:

> "[W]e think it significant that Lieutenant Warner * * * had access to legitimate procedural mechanisms for airing his grievances. Had he utilized the appropriate channels, of which he admits he was aware, he could have brought Major Crone's alleged misconduct to light without exposing himself to the risk of disciplinary action. In this regard, we agree with Judge Eshenburg, the trial judge, who stated, in a well reasoned discussion on the constitutional aspects of this case: 'It was not the contents of the letter that resulted in [Warner's] demotion, rather [it was] the means employed * * * in the letter's publication and his admitted violation of Rules and Regulations.' Warner's punishment resulted from 'the place, means and unusual manner in which he chose to speak.'" *Warner*, 567 A.2d at 168.

The School here is much like the police department in *Warner*, and the same degree of discipline, harmony, and loyalty on the part of its employees is a justified expectation in order for the School to accomplish its mission.

■ Turning to Mekss' claim that the telephone calls to Sherman deserve "whistle blower" status, we first consider the level of constitutional protection afforded at that juncture. Mekss' contentions are premised upon her perception that the anonymous letter and the telephone calls were indistinguishable ways of expressing essentially the same information. Thus, she concludes they should be entitled to the same constitutional consideration. We do not accept that contention.

In marked contrast to the assertions set forth in her anonymous letter, Mekss did not have the same necessary degree of personal knowledge about the investigation to justify her claimed "whistle blower" status in making her phone calls. *See Hughes v. Whitmer*, 714 F.2d 1407, 1423 (8th Cir. 1983), *cert. denied sub nom. Hughes v. Hoffman*, 465 U.S. 1023, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984). She presented no evidence that the results of the investigation were incomplete or inaccurate. While Mekss had personal knowledge of those things she addressed in her anonymous letter, she had, at the most, only slight personal knowledge of how the results of the investigation interviews were tabulated. She argues that as many as eighteen of her fellow employees agreed the investigation was a "whitewash," but the fact that the investigation was flawed is simply speculation on her part. The results indicated that six employees were "universally dissatisfied" with conditions at the School. Regardless of what her fellow employees told her about their comments to the investigators, Mekss simply was not in a position to know with any degree of reliable certainty that the reported results were not correct. In the absence of other evidence, her speculation is not adequate to overcome the presumption that the investigation was properly conducted and reported.

We conclude that Mekss' telephone calls to Sherman did not acquire automatic "whistle blower" protection and, in that light, we apply the sequential test summarized in *Schalk*, 906 F.2d 491. In determining the extent of the constitutional protection afforded Mekss, we first consider whether the speech touches on a matter of public concern. Our evaluation of that question demands analysis of the "content,

form, and context" of the statement as revealed by the whole record. *Connick*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1689. If the content of the speech focuses on disclosing public officials' wrongdoing, it is more likely to be considered a matter of public concern. *Wulf v. City of Wichita*, 883 F.2d 842 (10th Cir.1989). Conversely, speech is not entitled to protection as a general matter if the point is simply to air grievances of a purely personal nature. The pertinent inquiry in this regard becomes whether the employee is speaking as a citizen about a matter of public concern or as an employee addressing a matter of personal interest. *Connick*.

In relation to the telephone calls, the United States Supreme Court recognized in *Connick*, 461 U.S. 138 at 146, 103 S.Ct. 1684 at 1690 that:

" * * * When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment."

It is arguable here as to whether these telephone calls touched upon matters of public concern. Mekss' position is that the product of any investigation of a state institution is a matter of public concern since the entire state has an interest in an institution like the School. The School argues, to the contrary, that Mekss' telephone calls to Sherman did not involve a legitimate matter of public concern. The record demonstrates that, before these telephone calls were made, the issues that had been raised in Mekss' anonymous letter had been examined in what the record discloses to have been a thorough and comprehensive investigation. The summarized results of the investigation by the Board of Charities and Reform had been publicized. The telephone calls that Mekss made as a follow up reflect her personal disagreement with the way the investigation was pursued and with its results.

The record also demonstrates that the interview process by which the investigation was pursued was standardized, and the same questions were asked of each School employee. All of the School employees were involved; the interview process was not a sample of the employees. The reliability and validity of such a process generally is quite high, and it should be given substantial weight. The results of that investigation do not indicate that everything was perfect at the School; in fact, the report noted six "universally dissatisfied" employees. Mekss, however, did not have firsthand knowledge of what other employees told the investigators. Certainly, the possibility exists that they reported something entirely different to Mekss than what they actually told the investigators.[7] Examined in the light of these factors, there is little in the record to indicate that the information Mekss wanted to convey to Sherman in the telephone calls actually touched upon a matter of public concern. *Connick*, 461 U.S. 138, 103 S.Ct.

---

7. An example of how different communications may be made in different contexts is shown by Mekss' own performance evaluations. One of her complaints about the School was the lack of communication and the unresponsiveness of management to employee concerns. This issue was raised numerous times in the course of the hearing. Yet, the two formal performance evaluations admitted into evidence at her hearing contain these comments from Mekss under the heading "Employee Comments":

"An atmosphere of open communication and high degree of accessibility to my superiors has greatly enhanced my ability to perform and is greatly appreciated." Mekss' Performance Appraisal dated January 29, 1987.
"This evaluation is very generous. I do not believe that I could do my job as well if not for the openness, honesty, direct communication, expertise, understanding & encouragement of my supervisor." Mekss' Performance Review Report dated August 23, 1988. [This was written by Mekss eleven days after she wrote her anonymous letter to the Board of Charities and Reform and during the same period of time that the Wyoming Girls' School investigation was going on!]

These comments which were part of the record before the Personnel Review Board, even though they were not discussed at that hearing, do not manifest complaints from someone who, in another context, claimed harassment, intimidation, and total lack of managerial openness. Mekss herself was sending mixed signals with respect to her job satisfaction and the conditions at the School.

1684. Other than Mekss' contention, which is not objectively supported, there is no substantive evidence in the record that the results of the investigation were inaccurate or that the investigative process was flawed.[8]

Whether speech involves a matter of public concern ultimately is a question of law. *Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315, *reh'g denied* 483 U.S. 1056, 108 S.Ct. 31, 97 L.Ed.2d 819 (1987). One interpretation of this record is that Mekss' phone calls were not based on public-spirited concern but, instead, were motivated by her personal displeasure with the results of the investigation or even some other motive. *See Leiphart v. North Carolina School of the Arts,* 80 N.C.App. 339, 342 S.E.2d 914 (1986), *cert. denied* 318 N.C. 507, 349 S.Ed.2d 862 (1986). It is equally unclear whether the point of Mekss' telephone calls was to bring wrongdoing to light or to further a purely private interest. *Hesse v. Board of Education of Township High School District No. 211, Cook County, Illinois,* 848 F.2d 748 (7th Cir.1988), *cert. denied* 489 U.S. 1015, 109 S.Ct. 1128, 103 L.Ed.2d 190; *reh'g denied* 490 U.S. 1059, 109 S.Ct. 1973, 104 L.Ed.2d 442 (1989). It is a close decision as to whether the telephone calls pass the first constitutional hurdle.

■ On this score, also, we will assume, without deciding, that Mekss did satisfy her burden and that the calls do meet the requirements of the first step in the constitutional analysis that a matter of public concern be involved. In part, this benefit of the doubt is afforded because Mekss was constrained by the requirements of the Personnel Review Board from presenting evidence concerning inaccuracies in the investigation. We also note that there is no record of whether this issue was argued and decided by the district court. Having

conceded for purposes of this case that the telephone calls involved a matter of public concern, we then pursue the second step in the analysis, the *Pickering* balance.

The balance described in *Pickering* requires that the interests of an employee as a citizen commenting upon matters of public concern be weighed with the interests of the State as an employer in promoting the efficiency of the public service it performs to its employees. *Pickering v. Board of Education of Township High School District 205, Will County, Illinois,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). The United States Supreme Court discussed this balancing test in *Rankin,* 483 U.S. at 384, 107 S.Ct. at 2896–97, in this way:

"The determination whether a public employer has properly discharged an employee for engaging in speech requires 'a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, [1734–35] 20 L.Ed.2d 811 (1968); *Connick v. Myers,* 461 U.S. 138, 140, 103 S.Ct. 1684, [1686] 75 L.Ed.2d 708 (1983). This balancing is necessary in order to accommodate the dual role of the public employer as a provider of public services and as a government entity operating under the constraints of the First Amendment. On the one hand, public employers are *employers,* concerned with the efficient function of their operations; review of every personnel decision made by a public employer could, in the long run, hamper the performance of public functions. On the other hand, 'the threat of dismissal from public employment is * * * a potent means of inhibiting speech.'

---

**8.** The Personnel Review Board established a rather strict and quite narrow forum for the parties to argue the merits of Mekss' dismissal. The Board clearly stated that it was not inclined to hear testimony or examine evidence that did not tie directly to whether there was due cause for dismissal and whether proper dismissal procedures were followed. Thus, Mekss' counsel may have been dissuaded from presenting whatever evidence Mekss had regarding inaccuracies or improprieties in the product of the investigation. Still, counsel had the obligation to the client to attempt to present such evidence if it was perceived as relevant, and to make a timely objection should the Board have refused its admission.

*Pickering,* 391 U.S., at 574, 88 S.Ct., at 1737. Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech." (Emphasis in original.)

The United States Court of Appeals for the Tenth Circuit has described other pertinent balancing considerations including:

" * * * 'Whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.' *Rankin v. McPherson,* 483 U.S. 378, 388, 107 S.Ct. 2891, 2899, 97 L.Ed.2d 315 (1987). The *Rankin* court also considered the manner, time, and place of the employee's expression, as well as the context in which the dispute arose." *Schalk,* 906 F.2d at 496.

It is our conclusion that the balancing of the interests in connection with Mekss' telephone calls to Sherman, in the light of *Pickering,* tips in favor of the School. The School is a publicly-funded state institution, and it is charged with providing educational, vocational, and rehabilitative services to troubled adolescent girls. In some respects, it may resemble a penal institution, but the School places a much stronger emphasis on the positive aspects of rehabilitation and education. That emphasis is reflected in the institutional atmosphere which the School administration endeavored to maintain. One goal of the School has been to teach its residents that the best way to solve a problem is to meet the situation and deal with it in a direct and honest way; not to endeavor to circumvent authority and evade responsibility. A trusting staff, able to impose confidence in co-workers and their intentions, and working toward a common purpose, is an essential prerequisite to the attainment of the goal and ultimate institutional success. The adolescent residents at the School create an inherent potential of physical danger

to School staff, and the need of the staff to rely with confidence upon co-workers is vital. The School has a valid and important interest in maintaining discipline and *esprit de corps.* *Crain v. Board of Police Com'rs of Metropolitan Police Dept. of City of St. Louis,* 920 F.2d 1402 (8th Cir. 1990); *Hughes,* 714 F.2d 1407. The chain-of-command rule applied by the School in this case is designed and intended to protect that very interest. *Perry v. City of Kinloch,* 680 F.Supp. 1339 (E.D.Mo.1988). If suspicion of co-workers or uncertainty as to trustworthiness is present, those factors are disruptive and counterproductive. The goal of the School is to establish a wholesome environment with individual role models for the residents; not to demonstrate distrust or hypocrisy.

In light of these factors, we hold that Mekss' telephone calls to Sherman directly impaired Geisler's authority and ability to discipline the staff. When Mekss told him that her first call to Sherman had nothing to do with the School, and then promptly called Sherman again to complain about the investigation, there was deception that was deliberate, if not an intentional untruth. Those calls did have a direct and detrimental impact on Geisler's confidence in Mekss' loyalty to the School and to him. It is true that Mekss' ability to perform her duties might not have been affected, but the potential of her calls interfering with regular School operations is obvious. *See generally Melton v. City of Oklahoma City,* 879 F.2d 706 (10th Cir.1989), *on reh'g vacated and remanded on other grounds* 928 F.2d 920 (10th Cir.1991). The School's interest in maintaining good working relationships within the staff and a stable public image weighs more heavily in the light of *Pickering* than Mekss' interest in repeatedly attempting to tell Sherman her views about the results of the investigation. *Rankin,* 483 U.S. 378, 107 S.Ct. 2891.

This case is like that envisioned by the United States Supreme Court in *Arnett,* 416 U.S. 134, 94 S.Ct. 1633. The discipline administered to Mekss was not directed "at speech as such, but at employee behavior, including speech, which [was] detrimental

to the efficiency of the employing agency." *Arnett,* 416 U.S. at 162, 94 S.Ct. at 1648. *See Battiste v. Department of Social Services,* 154 Mich.App. 486, 398 N.W.2d 447 (1986). We hold that the School's dismissal of Mekss is permitted because her actions undermined Geisler's managerial authority. Length of service and an unblemished work record do not suffice to justify open insubordination. A limited First Amendment interest involved in connection with the telephone calls to Sherman does not require that the School tolerate this action which reasonably could be expected to disrupt operations, undermine authority, and destroy close working relationships. Because Mekss' actions already have undermined, and indeed enhanced the potential for undermining, Geisler's authority, she does not survive the balancing test required by *Pickering. Huber v. Leis,* 704 F.Supp. 131 (S.D.Ohio 1989). There is no reason to set aside the Personnel Review Board's decision because of a violation of Mekss' First Amendment rights.

■ While the parties do not debate the sufficiency of the decision of the Personnel Review Board and the record, we recognize a duty to be satisfied in that regard. That duty flows from Rule 12.09, W.R.A.P., and § 16–3–114(c), W.S.1977 (July 1990 Repl.).[9] Under our cases, the duty to review the record is a tandem process. First, we review the record as a whole to determine whether the agency's findings of fact are supported by substantial evidence. *Holding's Little America v. Board of County Commissioners of Laramie County,* 670 P.2d 699 (Wyo.1983), *appeal after remand* 712 P.2d 331 (1985); *Toavs v. State By & Through Real Estate Commission,* 635 P.2d 1172 (Wyo.1981). Substantial evidence in this context means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State ex rel. Workers' Compensation v. Ohnstad,* 802 P.2d 865 (Wyo.1991); *Shenefield v. Sheridan County School District No. 1,* 544 P.2d 870, 874 (Wyo.1976), quoting from *Howard v. Lindmier,* 67 Wyo. 78, 214 P.2d 737, 740 (1950). Findings of fact are supported by substantial evidence if, from the evidence preserved in the record, we can discern a rational premise for those findings. *ANR Production Co. v. Wyoming Oil & Gas,* 800 P.2d 492 (Wyo.1990); *Employment Security Commission of Wyoming v. Western Gas Processors, Ltd.,* 786 P.2d 866 (Wyo.1990). The second step is a determination as to whether the conclusions of law made by the agency are in accordance with law. *Belle Fourche Pipeline Co. v. State,* 766 P.2d 537 (Wyo. 1988). Conclusions of law are affirmed if they are in accord with the law. *Department of Revenue and Taxation of State of Wyoming v. Casper Legion Baseball Club, Inc.,* 767 P.2d 608 (Wyo.1989). If conclusions of law are not in accord with applicable rules, they are corrected. *Employment Security Commission.*

■ In accomplishing our review, we are not bound to accept any of the determinations of the district court and are not re-

---

9. Rule 12.09, W.R.A.P., provides, in pertinent part:

"The review [of an administrative action] shall be conducted by the court without a jury and shall be confined to the record as supplemented pursuant to Rule 12.08, W.R.A.P., and to the issues raised before the agency. The court's review shall be limited to a determination of the matters specified in § 16–3–114(c)."

Section 16–3–114(c), W.S.1977 (July 1990 Repl.), provides, in pertinent part:

"(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

\* \* \* \* \* \*

"(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

"(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

"(B) Contrary to constitutional right, power, privilege or immunity;

"(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

"(D) Without observance of procedure required by law; or

"(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute."

quired to afford those determinations deference but, instead, we are obligated to review the appeal as if it came directly to this court from the agency. *Sellers v. Wyoming Board of Psychologist Examiners,* 739 P.2d 125 (Wyo.1987). Deference is afforded to the determinations of fact made by the agency and not to the decisions of the district court. *Zezas Ranch, Inc. v. Board of Control,* 714 P.2d 759 (Wyo. 1986). *See Palmer v. Board of Trustees of Crook County School Dist. No. 1,* 785 P.2d 1160 (Wyo.1990). We are entitled to rely upon and afford deference to any agency expertise in weighing the evidence, and we do not disturb the determination by the agency unless it is "clearly contrary to the overwhelming weight of the evidence on record." *State ex rel. Workers' Compensation v. Brown,* 805 P.2d 830, 833 (Wyo. 1991); *Employment Security Commission,* 786 P.2d at 871, quoting from *Southwest Wyoming Rehabilitation Center v. Employment Security Commission of Wyoming,* 781 P.2d 918, 921 (Wyo.1989).

■ On review, the burden is assigned to the appellant to demonstrate that the agency's findings and conclusions are not supported by substantial evidence. *Westates Construction Co. v. Sheridan County School District No. 2, Board of Trustees,* 719 P.2d 1366 (Wyo.1986). If substantial evidence is found, the fact that two different conclusions may be drawn from the evidence does not inhibit a holding that the conclusion drawn by an administrative agency was supported by substantial evidence. *Vandehei Developers v. Public Service Commission of Wyoming,* 790 P.2d 1282 (Wyo.1990).

[10] Our law requires a degree of detail in the findings of fact and conclusions of law made by an administrative agency. One of the fundamental purposes of the Wyoming Administrative Procedure Act is to assure that controverted issues involved in any contested case will be fully developed before the agency as a finder of fact. "A record of material and substantial evidence must be created so that a reviewing court can determine whether such factual development occurred or whether, instead,

the agency's actions were based on unwarranted or undeclared assumptions." *Jackson v. State ex rel. Wyoming Workers' Compensation Division,* 786 P.2d 874, 877 (Wyo.1990). Section 16–3–110, W.S.1977 (July 1990 Repl.), supports this proposition by requiring that:

" * * * Findings of fact if set forth in statutory language, shall be accompanied by a concise and explicit statement of the underlying facts supporting the findings."

Our rule is that this statutory provision demands findings of basic facts upon all material issues in the proceeding and upon which the ultimate findings of fact or conclusions are based. *FMC v. Lane,* 773 P.2d 163 (Wyo.1989). In *Cook v. Zoning Board of Adjustment for the City of Laramie,* 776 P.2d 181, 185 (Wyo.1989), we stated:

"It is insufficient for an administrative agency to state only an ultimate fact or conclusion, but each ultimate fact or conclusion must be thoroughly explained in order for a court to determine upon what basis each ultimate fact or conclusion was reached. The court must know the why." *Geraud v. Schrader,* 531 P.2d 872, 879 (Wyo.), *cert. denied sub nom. Wind River Indian Education Association, Inc. v. Ward,* 423 U.S. 904, 96 S.Ct. 205, 46 L.Ed.2d 134 (1975).

In *Jackson,* 786 P.2d 874, 878, we set forth this statement of the rule:

"We have held it essential to surviving judicial review that the record of a contested agency action contain such factual findings as would permit a court to follow the agency's reasoning from the evidentiary facts on record to its eventual legal conclusions. *Larsen v. Oil and Gas Conservation Comm'n,* 569 P.2d 87, 90–91 (Wyo.1977); *Powell v. Board of Trustees, Crook County School District No. 1,* 550 P.2d 1112, 1120 (Wyo.1976). Similarly, we have held that a contested case hearing must provide, and the record of that proceeding must document, information sufficient to the making of a reasonable decision. Absent such information, the agency decision must be set aside as arbitrary. *Western*

*Radio Communications, Inc. v. Two-Way Radio Service, Inc.*, 718 P.2d 15, 20 (Wyo.1986); *Monahan v. Board of Trustees, Elementary School District No. 9*, 486 P.2d 235, 237 (Wyo.1971). The need for such strict compliance with statutory provisions relating to the content of the agency record derives largely from a need to ascertain whether contested case hearings actually provide statutorily mandated procedural protections. To assure the due process protections inherent in the [Wyoming Administrative Procedure Act's] statutory scheme will be given effect, this court requires strict compliance with those procedural provisions."

In the process of judicial review, no presumption attaches to a general finding because of the specific requirements of § 16–3–110, W.S.1977, quoted above. If any agency action is premised upon a decision entered without observance of the procedure required by law, that decision must be held unlawful and set aside. *FMC*, 773 P.2d 163. If the findings do not adequately reflect the justification for the agency position that is adopted, then the case must be remanded to the agency so that requisite supplemental findings can be made. A decision that does not comply with these requirements is subject to attack as being arbitrary, capricious, and contrary to law. *Mountain Fuel Supply Co. v. Public Service Commission of Wyoming*, 662 P.2d 878 (Wyo.1983).

In the course of her argument, Mekss asserts that the decision of the Personnel Review Board that affirmed her dismissal failed to meet the foregoing standards by incorporating specifically detailed findings to support the ultimate facts and conclusions. In considering this contention, we will scrutinize the findings and conclusions of the Personnel Review Board and arrive at the determination as to whether they are sufficiently supported to justify an affirm-

ance. The Board incorporated five conclusions, but we think that its first conclusion:

"1. Ms. Mekss created disharmony in the function of the Wyoming Girls' School and circumvented established lines of authority."

is the significant basis for the Board's decision. One of the reasons stated in the notice of termination furnished to Mekss involved insubordination based upon circumventing established lines of authority. The first conclusion of the Board addresses this matter. Insubordination is cause for dismissal according to the personnel rules, and a factual finding by the Board that Mekss was insubordinate would justify the dismissal in accordance with this conclusion.[10]

We then examine only that finding of fact that relates to this particular conclusion. Finding No. 3 states:

"3. Ms. Mekss failed to exhaust the normal personnel system options by taking issues directly to Mr. Geisler prior to proceeding in the manner in which she did."

This finding relates specifically to insubordination by Mekss and her circumvention of established lines of authority. Our examination of this finding requires a determination as to whether it sufficiently articulates the reasons for the Board's affirmation of Mekss' dismissal pursuant to § 16–3–110, W.S.1977, and, secondly, whether it is supported by substantial evidence. It is our conclusion that Finding No. 3 is sufficient to meet the statutory requirement set forth in the statute. In *Westates*, 719 P.2d 1366, 1371, we said:

"While perhaps not a model of perfection, the findings of fact by the Board in this case are sufficiently definite to permit judicial review of the Board's action, and they satisfy the test of our earlier cases."

It follows that this single, viable finding of basic fact, sufficient to support one valid

---

10. We take judicial notice of the State of Wyoming Personnel Rules in effect at the time of Mekss' dismissal. Chapter XII, Discipline, Section 1, Reasons for Discipline, states:

"(a) An agency head may discipline an employee for cause including, but not limited to, the following reasons:

\* \* \* \* \* \*

"(vi) Insubordination; \* \* \*."

and legally correct conclusion, justifies affirming Mekss' dismissal.

We then turn to the requirement of substantial evidence to support the finding that Mekss was guilty of insubordination in the context of the personnel rules. The record adequately discloses that Mekss failed to exhaust available administrative procedures prior to sending the anonymous letter and prior to making the telephone calls to Sherman. We are not completely certain what is connoted by the Board's reference to "normal personnel system options," but we would understand this phrase to relate to face-to-face communication with supervisory personnel and the use of traditional internal grievance procedures. There is no question that all employees repeatedly were encouraged to bring problems and concerns to Geisler and other members of the School administration staff. Mekss did not follow this recourse, and she also told Geisler, during their meetings on November 30 and December 5, that her attempts to contact Sherman did not involve School matters. Effective operation of a governmental function permits the employer to require honesty and loyalty from employees. In a state institutional setting that is designed to fulfil rehabilitative and educational purposes, honesty, loyalty, harmony, and efficiency become even more critical. The desirable effect of positive role modeling on impressionable residents at the School becomes a vital and necessary attribute for all employees. We understand that Mekss' attempts to draw a distinction between *matters involving* the School and the underlying investigation of the School, but this is simply a semantic affect in Mekss' argument. What is easy to see is that Geisler could interpret these actions by Mekss as dishonest and disloyal.

As we have held earlier, the anonymous letter qualifies as protected speech in the context and manner in which it was used. Mekss' telephone calls, as we also have held earlier, are not similarly protected. Finding No. 2 of the Personnel Review Board does mention anonymous letters, but we find no support in the record for the contention that the reason the Personnel Review Board affirmed Mekss' dismissal was because she had written an anonymous letter. We do find substantial evidence in the record to demonstrate that Mekss violated an obligation to her employer to exhaust "normal personnel system options" before calling Sherman with complaints about the investigation. There is no question that substantial evidence does support Finding No. 3, and this finding identifies the behavior relied on by the Personnel Review Board to justify dismissal based on insubordination.

We do modify Conclusion No. 1 so that it should read:

"Ms. Mekss was insubordinate in circumventing established lines of authority."

As drafted by the Board, Conclusion No. 1 also had incorporated that Ms. Mekss created disharmony in the function of the Wyoming Girls' School. There is no finding of fact by the Personnel Review Board that justifies this conclusion, and we are not persuaded that substantial evidence in the record supports the actual creation of disharmony by Mekss. *See Schalk,* 906 F.2d 491. We, therefore, correct the conclusion of law in accordance with our rule found in *Employment Security Commission,* 786 P.2d 866.

As modified and corrected, this conclusion of the Personnel Review Board is supported by an appropriate finding of fact that is supported by substantial evidence. It justifies Mekss' dismissal. She had access to internal grievance procedures available under the personnel rules, and she chose not to use them. Her own testimony discloses knowledge of Geisler's repeated verbal and written efforts to invite employee input, but she did not comply with those efforts. On the basis of our conclusion that substantial evidence supports Finding No. 3 which is the justification for Conclusion No. 1, as modified, we hold that it is unnecessary to remand the case to the district court for further remand to the Personnel Review Board for additional findings and conclusions. The rule adopted in *FMC,* 773 P.2d 163, is satisfied.

As the second issue raised in this case, Mekss urges that the School violated the state personnel rules by failing to pursue successive levels of discipline prior to her dismissal. Mekss finds support for this argument in Conclusion No. 2 of the decision of the Personnel Review Board, which states:

"2. Mr. Geisler did not fully comply with the DAFC Personnel Rules and Regulations in his application by consistent, well-defined, and progressive disciplinary measures prior to his dismissal of Ms. Mekss."

This record demonstrates that Mekss knew of Geisler's emphasis and insistence upon bringing concerns about School operations to his attention or to that of other administrators. Geisler sent memoranda to the staff and addressed specific remarks to them relating to the importance of internal communication. On November 30, 1988, Geisler met with Mekss after her first telephone call to Sherman. He then asked whether she had concerns about the School, and she advised that she did not. Geisler then reminded Mekss of her responsibility to come to him with complaints or concerns, but he did not initiate other formal disciplinary action.

After Mekss' second telephone call to Sherman, Geisler met with her on December 5, 1988 to impose discipline for her behavior. That meeting and the fact that Geisler issued a ten-day suspension and required Mekss to write a letter of apology reasonably could be perceived as a disciplinary "step" prior to dismissal. We conclude that we need not decide whether such discipline satisfies the "successive step" requirement under the personnel rules because a plain reading of those rules allows for immediate dismissal of a permanent employee for flagrant conduct. The pertinent portion is found in Chapter XII, Discipline, State of Wyoming Personnel Rules, in effect at the time of Mekss' dismissal, and it states:

"Section 2. *Determination of Appropriate Discipline.*

"(a) Agency heads should, *except in cases of flagrant employee behavior*, at-

tempt to administer employee discipline in progressive stages so as to seek corrective results. * * * " (Emphasis added.)

\*    \*    \*    \*    \*    \*

"Section 3. *Types of Discipline.*

\*    \*    \*    \*    \*    \*

"(c) Dismissal.

"(i) Dismissal of Permanent Employees. If previous disciplinary action has not served to achieve corrective results, *or if the nature and extent of the just cause is such that other disciplinary action is not appropriate*, the agency head may dismiss a permanent employee for the good of the service." (Emphasis added.)

■ We affirm the reversal by the district court of Conclusion No. 2 of the Personnel Review Board which reads as follows:

"2. Mr. Geisler did not fully comply with the DAFC Personnel Rules and Regulations in his application by consistent, well-defined, and progressive disciplinary measures prior to his dismissal of Ms. Mekss."

The Personnel Review Board did not provide findings of fact to support Conclusion No. 2. Our examination of the record did not develop substantial evidence to support a conclusion that Geisler did not fully comply with the personnel rules because those rules explicitly grant authority to dismiss a permanent employee for flagrant behavior without going through successive steps of discipline. For this reason, Geisler was not obligated to impose progressive discipline prior to dismissing Mekss, particularly in view of her refusal to write an appropriate apology. The circumstances in this case were sufficient to justify summary dismissal when Mekss, after repeated attempts to contact Sherman, failed to accept discipline that would have involved a reasonable letter of apology. Her letter was only a continuation of the crusade relating to the School that could not be constitutionally protected once the investigation had been accomplished.

■ The last issue in Mekss' brief is whether the School was without standing

to appeal the decision of the Personnel Review Board that awarded her the five months back pay and benefits. As we have noted, the School took a cross-appeal to the district court from the decision of the Personnel Review Board, claiming that the award of the back pay was arbitrary, capricious, an abuse of discretion, in excess of the Board's statutory authority, and unsupported by substantial evidence. In our judgment, this issue is controlled by statute and by our holding in *Pritchard v. State, Division of Vocational Rehabilitation, Department of Health and Social Services*, 540 P.2d 523 (Wyo.1975). In *Pritchard*, we analyzed the statutory terms "person" and "agency" in light of the definitions in the Wyoming Administrative Procedure Act. We held that an agency is without the right to appeal an adverse administrative decision to the district court, saying:

> "The conclusion we reach here is bottomed in the plain English language reading of the rules and statutes and represents the overwhelming weight of authority under statutes and rules identical with or similar to our Administrative Procedure Act and Rule 72.1, W.R.C.P.
>
> \* \* \* \* \* \*
>
> " \* \* \* [I]f an 'agency' is given a specific right to appeal to the courts, such a grant is within the power of the legislature and must be honored. But there must be an applicable appeal procedure spelled out in the statute. It cannot be inferred and, as here, where the statute specifically *excludes* an agency's right of appeal, there cannot be any question but that the agency enjoys no such appellate privileges." (Emphasis in original.) *Pritchard*, 540 P.2d at 527, 529.

This rule was reiterated in *Hupp v. Employment Security Commission of Wyoming*, 715 P.2d 223, 224 n. 1 (Wyo.1986), when we stated:

> "The agency itself cannot bring an appeal to the district court because it is not a 'person aggrieved or adversely affected in fact by a final decision of an agency in

a contested case.' Section 16–3–114(a), W.S.1977; *Pritchard v. State, Division of Vocational Rehabilitation, Department of Health and Social Services*, Wyo., 540 P.2d 523, 526 (1975)."

The School argues that *Pritchard* is not applicable in this case. It contends that Mekss raised the question of standing for the first time before this court. This argument can be resolved expeditiously because standing in this context essentially is a jurisdictional issue concerning the power of the court to hear and decide a case. In that context, standing can be raised at any time in a judicial proceeding.

The School then argues that once Mekss petitioned for review, the School became a proper and aggrieved party. The State endeavors to avoid the definitional barrier in light of *Pritchard* and the Wyoming Administrative Procedure Act by arguing that *Pritchard* should be modified to allow an agency to cross-appeal. Although the State presents a concise and forceful argument in this regard, it still must be recognized that it is within the province of the legislature to consider and, if necessary, redefine whether an administrative agency may appeal or cross-appeal to the district court. We note in passing that there is no inhibition upon the right of an agency to appeal an adverse decision from the district court to the Supreme Court. *See Safety Medical Services, Inc. v. Employment Security Commission of Wyoming*, 724 P.2d 468 (Wyo.1986). In our view, *Pritchard* and the Wyoming Administrative Procedure Act should be construed to inhibit cross-appeals brought by an agency at the district court level like a direct appeal is inhibited.

Ultimately, the School argues that the Personnel Review Board was without authority and jurisdiction to order the payment of public funds from the state treasury. The State argues that the remuneration "ordered" by the Board violates state personnel rules and the Wyoming constitution.[11] As a matter of logic, the State

---

**11.** Appellees rely on Chapter XIII, Grievances and Appeals, State of Wyoming Personnel Rules:

presents the proposition that, if the Personnel Review Board found substantial evidence to justify Mekss' termination, then the award of remuneration is antithetical to its affirmation of her discharge. Certainly, this contention may have a good deal of merit.

We do not need to decide that question in this case, however. The application of the rule in *Pritchard* leads to a conclusion that the School did not have standing to cross-appeal to the district court. For that reason, the district court was without jurisdiction to adjudicate the issues presented by the cross-appeal.

The School is not without recourse. A conclusion that the Personnel Review Board's award of five months back pay and benefits cannot be addressed in this proceeding does not require the State to make the payment. If the State refuses to pay, Mekss could sue for the money or, alternatively, the School could seek a declaratory judgment with respect to the authority of the Personnel Review Board to "order" remuneration. Since we conclude that the district court did not have jurisdiction over this issue, we reverse that portion of the district court order that reverses the award of back pay.

In summation, we hold that Mekss' constitutional right of free speech was not infringed with respect to any matter of public concern when she was dismissed from her position as a bookkeeper at the School. We have recognized her constitutionally protected right of free speech to the extent that it was exercised appropriately but, with respect to those actions which do not manifest a constitutionally protected right, we have approved their use

as a premise for a valid discharge. We hold that there was no violation of the state personnel rules by the School, and we affirm the order of the district court that affirmed the decision of the Personnel Review Board in turn approving the dismissal of Mekss by the School. We reverse that portion of the order of the district court that reversed the award of remuneration on the ground that the district court was without jurisdiction over the cross-appeal by the School.

Affirmed in part and reversed in part.

CARDINE, J., files a specially concurring opinion.

URBIGKIT, C.J., files a dissenting opinion in which GOLDEN, J., joins.

CARDINE, Justice, specially concurring.

I concur in the opinion of the court affirming the dismissal of appellant. I concur also in the reversal of the district court order denying appellant five months' pay awarded by the personnel review board because of the precedent established by *Pritchard v. State, Div. of Vocational Rehabilitation, Dep't of Health and Social Serv.*, 540 P.2d 523 (Wyo.1975). I must, however, express my opinion that there is no logical or sound reason for denying the State of Wyoming a right of appeal. The present state of law makes final a board decision against the State no matter how absurd or wrong it may be. It is possible that in the future the State may be the victim of an unwarranted multimillion dollar award and powerless to do other than pay. When that case comes before us, we will be hard pressed to continue the rule of

---

"Section 6. *Dismissal Appeals.*

\* \* \* \* \* \*

"(e) Hearing Authority Purpose and Authority.
"(i) The purpose of the hearing is to determine whether there exists good cause for the dismissal. The Hearing Authority shall decide, based upon all of the evidence produced at the hearing and upon no other basis, whether the allegations made in support of the dismissal are true and, if true, whether they fairly and reasonable constitute grounds for dismissal under the Personnel Rules.

"(ii) The Hearing Authority shall affirm or reverse the dismissal and/or *recommend* other personnel actions so long as the decisions and recommendations are not in conflict with Personnel Rules and State Statutes." (Emphasis added.)

Appellees also find support in Article 3, § 35, of the Wyoming Constitution which states in part:
" \* \* \* [M]oney shall be paid out of the treasury only on appropriations made by the legislature, and in no case otherwise than upon warrant drawn by the proper officer in pursuance of law."

*Pritchard.* Perhaps the legislature will look at this state of the law before the hard case comes along. At a minimum, I would hold that when the "person" aggrieved by the board's decision initiates an appeal, the State is then in court and may respond to the appeal by cross-claim or otherwise.

URBIGKIT, Chief Justice, dissenting, with whom GOLDEN, Justice, joins.

## INTRODUCTION

This is a public employee termination case. Regina Mekss was discharged from her employment with the Wyoming Girls' School (a juvenile confinement facility) because she went outside the School's chain of command by a telephone call to the Executive Secretary of the Board of Charities and Reform to challenge the sufficiency of the Board's investigation into reports of management problems at the institution. Violating the chain of command was characterized as insubordination and justification for her dismissal by the School.

This court holds that her dismissal does not violate the First Amendment of the United States Constitution because the School's "interest in maintaining discipline and *esprit de corps*" outweighs her right to freedom of speech. Because her efforts and the telephone call addressed a matter of public concern and did not adversely affect the operation of either the School or the Board, I dissent.

By demonstrating that it is again the messenger who is at risk, this whistleblower case does not suit my sense of either justice or justification to approve Mekss' termination from public employment. As Justice Thurgood Marshall observed in dissent, denial of, or discharge from, public employment is "a serious blow to any citizen * * * [w]hen something as valuable as the opportunity to work is at stake, the government may not reward some citizens and not others without demonstrating that its actions are fair and equitable." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 589, 92 S.Ct. 2701, 2715, 33 L.Ed.2d 548 (1972).

Although whistleblowers are recognized as a "vital element of our democratic process" serving as "an early-warning system against fraud and deception within the government," reprisals against whistleblowers are often "swift and harsh." E. Slavin and T. Devine, *The Government's Secret War on Whistleblowers*, 18 ABA Barrister 12, 15, 36 (Spring 1991). Public employees who speak out should now fear that they will lose their jobs, forfeit salary increases, or be denied promotions. When faced with such consequences, self-imposed censorship is often the most prudent choice. This self-imposed censorship is of profound consequence not only to the millions [1] who work for the government, but also to the public who may have an interest in hearing their unexpressed views. *See* Massaro, *Significant Silences: Freedom of Speech in the Public Sector Workplace*, 61 S.Cal.L.Rev. 3 (1987). Professor Chafee has observed:

"The number of federal, state, and municipal employees is a substantial part of the working population. Add workmen in factories with government contracts and professors teaching in universities with a R.O.T.C. or a government grant for scientific research or an assigned unit from the Army or the Navy, and hardly anybody is left out. If millions of Americans lose freedom of speech and assembly by the mere act of earning a living, the First Amendment becomes a mockery."

Massaro, *supra*, 61 S.Cal.L.Rev. at 6 n. 15 (quoting Z. Chafee, *The Blessings of Liberty* 94 (2d ed. 1956)).

## CONSTITUTIONAL RIGHT TO FREE SPEECH

For more than twenty years, the law has been firmly established that a governmental entity cannot condition employment on any limitation that infringes the employee's constitutionally protected interest in freedom of expression. *See Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983) and *Schalk v. Galle-*

---

1. See, for statistics, D. Westman, *Whistleblow-* *ing: The Law of Retaliatory Discharge* 45 (1991).

*more,* 906 F.2d 491 (10th Cir.1990). The School impermissibly violated Mekss' constitutional right to speak on matters of public concern when it fired her for expressing her views and opinions to the Board and its Executive Secretary. *Schalk,* 906 F.2d 491.

## THE SEQUENTIAL TEST

This majority correctly adopts a sequential test to determine whether the School's action of dismissal impermissibly infringed upon Mekss' constitutionally protected right of free speech, as recently summarized in *Schalk.* In its analysis and application of the sequential test, the majority distinguishes two separate instances of communication initiated by Mekss: the first being the anonymous letter written to the Governor and the other members of the Board, and the second being a telephone call to the Executive Secretary of the Board regarding the investigation.[2] For purposes of applying the test, the majority assumes, without deciding, that each instance of communication addressed a matter of public concern.

## THE ANONYMOUS LETTER

The majority accepts Mekss' contention that the anonymous letter constituted whistleblowing speech and that it should be given the highest level of constitutional protection. It further agrees with Mekss that her interest in making the statement outweighed the interest of the School in stifling the speech. However, the majority then concludes that she failed to meet her burden of proving that the letter was a substantial or motivating factor in her dismissal. *Mt. Healthy City School Dist. Bd. of Ed. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977).

Although I disagree with the majority and suspect that the anonymous letter was a substantial or motivating factor in Mekss' dismissal, the record shows that the supervisor at the School testified that he did not dismiss Mekss for writing the anonymous letter, but for "circumventing established lines of authority" by making the one telephone call to the Executive Secretary of the Board. The majority modified the Personnel Review Board's Conclusion No. 1 to state that "Ms. Mekss was insubordinate in circumventing established lines of authority", thereby accepting the supervisor's testimony that Mekss was not dismissed for writing the anonymous letter but rather for making the telephone call. I will apply the sequential test to the telephone call to demonstrate that the School impermissibly infringed upon Mekss' right to free speech by dismissing her for making that telephone call. *Pickering v. Board of Ed. of Township High School Dist. 205, Will County, Illinois,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). *See also Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), which held that a college professor's public criticism of the Board of Regent's opposition to a proposal that the college be elevated to four-year status was constitutionally protected speech about a matter of public concern. Therefore, I find it unnecessary to further address the matter of the anonymous letter.

## PUBLIC CONCERN ANALYSIS

The United States Supreme Court in *Connick,* 461 U.S. 138, 103 S.Ct. 1684 held that a public employee's work-related speech is not covered by the First Amendment unless it addresses a matter of public

**2.** The record clearly shows that the telephone call by Mekss to K. Gary Sherman, Executive Secretary of the Board, was the result of a suggestion from Ms. Kathy Karpan, Secretary of State, who was a member of the Board by whom Sherman was employed. Mekss followed that suggestion and was then terminated. The factual superficiality and obviousness of this case is hardly subject to question. Notes of the facility director, Superintendent Jack Geisler, reveal an apparent warning by Sherman to

Mekss that "she should get on [the] right side or get out."

Subsequent to the occurrence of these events, the superintendent of the facility retired and, at a later date, the institution itself was transferred from the Board (confinement) to the Department of Family Services (social welfare and family support). No one will ever know how much contribution to public benefit this one strong-willed employee may have actually made.

concern and will not disrupt the workplace. Thus, the threshold inquiry in determining whether a governmental employer's employment decision violates the First Amendment rights of an adversely affected employee is whether the speech at issue "may be 'fairly characterized as constituting speech on a matter of public concern.'" *Rankin v. McPherson*, 483 U.S. 378, 384, 107 S.Ct. 2891, 2897, 97 L.Ed.2d 315, *reh'g denied* 483 U.S. 1056, 108 S.Ct. 31, 97 L.Ed.2d 819 (1987) (quoting *Connick*, 461 U.S. at 146, 103 S.Ct. at 1690). Speech on a matter of public concern is generally defined as speech "fairly considered as relating to any matter of political, social, or other concern to the community * * *," *Connick*, 461 U.S. at 146, 103 S.Ct. at 1690, in contrast to speech "as an employee upon matters only of personal interest * * *." *Id.* at 147, 103 S.Ct. at 1690. Thus, the purpose of the inquiry is to weed out a narrow range of employee speech which addresses purely personal disputes and is not entitled to First Amendment protection. *Berger v. Battaglia*, 779 F.2d 992, 998 (4th Cir.1985), *cert. denied* 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 720 (1986).

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48, 103 S.Ct. at 1690. This inquiry focuses on "the extent to which the content of the employee speech was calculated to disclose wrongdoing or inefficiency or other malfeasance on the part of governmental officials in the conduct of their official duties." *Koch v. City of Hutchinson*, 847 F.2d 1436, 1445 (10th Cir.), *cert. denied* 488 U.S. 909, 109 S.Ct. 262, 102 L.Ed.2d 250 (1988). "'The focus is on the role the employee has in advancing the particular expressions: that of a concerned public citizen, informing the public that the state institution is not properly discharging its duties * * *; or merely as an employee, concerned only with internal policies or practices which are of relevance only to the employees of that institution.'" *Id.* at 1445 (quoting *Cox v. Dardanelle Public School Dist.*, 790 F.2d 668, 672 (8th Cir. 1986)). *See also Wulf v. City of Wichita*, 883 F.2d 842, 857 (10th Cir.1989) and *Conaway v. Smith*, 853 F.2d 789, 796–97 (10th Cir.1988).

This record justifies my conclusion that the telephone call was made as a public employee speaking as a citizen and did indeed address a matter of public concern. *Rankin*, 483 U.S. 378, 107 S.Ct. 2891; *Connick*, 461 U.S. 138, 103 S.Ct. 1684. It was addressed directly to the sufficiency of the investigation which was a function and duty of the Board. Mekss had nothing personal to gain by airing her concerns. Her motive was to improve the education and treatment of the institutional clientele and to improve the working conditions of the employees. From her perspective, Mekss had sufficient reasons to view the investigation as superficial and inadequate because what she had reported and what she believed others had reported had not been sufficiently documented or considered in the official report.

The content of her statements, if true, suggest that the Board (or the School) was not properly discharging its duties. This falls into the category of "[s]peech that seeks to expose improper operation of the government or questions the integrity of governmental officials" which "clearly concerns vital public interests." *Conaway*, 853 F.2d at 797.

The majority erroneously concludes that because her telephone call addressed issues that had been discussed in the anonymous letter and the subsequent investigation, any further discussion on her part was in the nature of a personal grievance or complaint. *Connick*, 461 U.S. 138, 103 S.Ct. 1684. The majority fails to recognize that her speech at this juncture did not address the operation of the School per se, but rather the Board and the manner in which they conducted their investigation into matters concerning the School. To substantiate Mekss' view that the investigation was inadequate necessarily required that she reiterate specific statements she had made to the investigators, which of course reflected her concerns about the operation of the institution. Her concerns and resulting

statements cannot be fairly or accurately characterized as merely personal complaints concerning internal policies and practices of relevance only to Mekss as an employee. *Connick,* 461 U.S. at 148, 103 S.Ct. at 1690; *Cox,* 790 F.2d at 673.

For the sake of argument, assuming that the telephone call was purely critical of the School and not critical of the Board's investigation, it would still touch on a matter of public concern for essentially the same reasons the majority concludes that the anonymous letter touched on a matter of public concern.[3] *Conaway,* 853 F.2d 789; *Wren v. Spurlock,* 798 F.2d 1313 (10th Cir.1986), *cert. denied* 479 U.S. 1085, 107 S.Ct. 1287, 94 L.Ed.2d 145 (1987).

As the majority points out, the record does not support the veracity of Mekss' concerns as she was not permitted to present evidence concerning inaccuracies in the investigation to the Personnel Review Board. Whether her concerns were well founded is not significant since the strong interest in protecting this type of speech determines that the whistleblower need not be absolutely accurate to be protected by the courts. This court, in *Board of Trustees, Laramie County School Dist. No. 1 v. Spiegel,* 549 P.2d 1161 (Wyo.1976), held that the school district erred in discharging its tenured teacher for making and publishing statements critical of the school's administrator and of schools generally. This court concluded that absent proof that the

employee knowingly or recklessly made false statements, his criticism could not furnish a lawful basis for dismissal. *Id.* at 1176. *See also Pickering,* 391 U.S. 563, 88 S.Ct. 1731.

The majority also determines that the speech did not touch on a matter of public concern in part because Mekss did not have sufficient personal knowledge about the investigation. It is true she did not know how the results were tabulated. However, it is not necessary that she have intimate knowledge of how the investigation was conducted before her speech is protected by the courts. The courts have provided protection even though the speaker had no firsthand knowledge of the reported incidents. *Hughes v. Whitmer,* 714 F.2d 1407, 1423 (8th Cir.1983), *cert. denied* 465 U.S. 1023, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984).

The next inquiry is whether the communication disrupted the workplace. The United States Supreme Court in *Givhan v. Western Line Consol. School Dist.,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979) held that a teacher's series of private communications to her supervisor regarding racial discrimination at the school was protected speech. The court noted that when an employee expresses a grievance in a private meeting, courts can consider the time, place, and manner of the confrontation in evaluating whether it impeded institutional efficiency. *Id.* at 415 n. 4, 99 S.Ct. at 696 n. 4. It would follow that speech

---

3. The judiciary, in requirement to confine female juveniles, has a high interest in the performance of this institution with no other facility except the women's prison in Lusk, Wyoming available when something must be done with the individual. This controversy consequently involved the one available state institution for judicial commitment of the uncontrolled or criminally inclined juvenile females. *Wulf,* 883 F.2d 842. Nothing in this record shows that the judiciary was asked about agency performance when the Personnel Review Board rendered the decision adverse to the employee. The issue of institutional performance within its assigned mission of unquestionable importance to the state got lost in managerial ego and the "I am right, shut up" syndrome. The record realistically provides no compelling evidence to demonstrate that this employee was either right or wrong about the substance of employee concerns for the facility's basic operation.

Directly presented in the first sequence of these events was contention of mismanagement. The second sequence invoked the question of whitewash of that mismanagement. Nothing provided in this record permits or justifies determination whether either or both were the result of an unjustified, unprincipled, factually untrue malicious activity of the employee, or just a cover-up where the whistleblower is terminated so that problems will not be uncovered or publicly considered.

Attachments to Mekss' brief, which consisted of contemporary news stories from a statewide newspaper, were attacked by a motion to strike by the Attorney General's office. The motion was sustained by order of this court determining that "various news articles from the Casper Star–Tribune be stricken and shall be disregarded by the court."

that occurs away from the workplace, such as Mekss' telephone call to the Executive Secretary, poses an even less significant threat to the authority and efficiency of the institution than a private personal confrontation with a supervisor. Likewise, the majority concedes that there is insufficient evidence in the record to support a disruption in the workplace.

## THE *PICKERING* BALANCING TEST

The function of the *Pickering* test is to "balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734–35. Balancing the competing interests of the employee and the employer requires consideration of " 'whether the statement impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.' " *Wulf*, 883 F.2d at 861 (quoting *Rankin*, 483 U.S. at 388, 107 S.Ct. at 2899). *See also Pickering*, 391 U.S. at 570–73, 88 S.Ct. at 1735–37.

In determining that the scales of justice tip in favor of the public institution for this case, the majority relied upon the educational, vocational and rehabilitative nature of the services provided to the troubled adolescent girls combined with its "valid and important interest in maintaining discipline and *esprit de corps*." The majority concludes the chain of command rule was adopted to protect this interest and that by violating the chain of command, the School had just cause to dismiss Mekss from employment on grounds of insubordination. However, "[p]hrases like 'esprit de corps' or 'insubordination' should not lull judges into uncritical deference to public employers' decisions." Massaro, *supra*, 61 S.Cal.L.Rev. at 68.

The majority analogizes the School to a police force and stressed the importance of discipline, harmony, and loyalty in a law enforcement organization and holds that Mekss' telephone calls to the Executive Secretary of the Board "directly impaired Geisler's authority and ability to discipline the staff" and had a "direct and detrimental impact on Geisler's confidence in Mekss' loyalty to the School and to him." However, it then modifies the Personnel Review Board's conclusions by eliminating the conclusion that Mekss created disharmony in the function of the school by stating, "we are not persuaded that substantial evidence in the record supports the actual creation of disharmony by Mekss."

The Tenth Circuit Court of Appeals addresses the issue of disruption of the working environment in *Conaway*, 853 F.2d at 797–98:

> Disruptions in the working relationship between Conaway and his supervisors, and general disharmony in the office, are foreseeable consequences when an employee reports improper activities of coworkers or supervisors. We recognize, as did Justice Powell in his concurring opinion in *Rankin*, "that a public employer must have authority to maintain the efficiency as well as the integrity of his office." *Rankin*, 107 S.Ct. at 2899 n. *. We also recognize, however, the vital interest the public has in the integrity of those who administrate their government. *Brockell v. Norton*, 732 F.2d [664] at 668. [ (8th Cir.1984) ] It would be anomalous to hold that because the employee's whistle blowing might jeopardize the harmony of the office or tarnish the integrity of the department, the law will not allow him to speak out on his perception of potential improprieties or department corruption. *See Porter v. Califano*, 592 F.2d 770, 773 (5th Cir. 1979).

Another consideration under *Pickering* is whether Mekss' speech interfered with the performance of her daily job responsibilities. *Conaway*, 853 F.2d at 798. It is uncontested that Mekss was a valued employee up to the time of her discharge and her job performance was consistently eval-

uated as good to excellent. Furthermore, under *Pickering,* the danger to an agency's successful function due to an employee's speech is minimal where the employee serves no confidential, policy making or public contact role. *Rankin,* 483 U.S. 378, 107 S.Ct. 2891. Mekss worked as a fiscal control officer and served in no confidential, policy making or public contact role and therefore posed a minimal threat to the smooth function of the School. Her remarks did not interfere with the performance of her duties nor the ability of her co-workers to perform their duties.

Mekss was dismissed for the content of her speech. "Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the *content* of employees' speech." *Rankin,* 483 U.S. at 384, 107 S.Ct. at 2897 (emphasis added). She would not have been dismissed for circumventing the lines of authority had she contacted the Board with praise for their investigation or to commend the School's operation.

The majority has determined that the manner of Mekss' communication violated the School's chain of command. The majority, in upholding Mekss' dismissal, places undue emphasis on this issue. Once again, the majority fails to recognize that her speech at this juncture did not address the operation of the School per se, but rather the Board and the manner in which they conducted their investigation into matters concerning the School. Therefore, it would have been wholly inappropriate for Mekss or any citizen to address concerns about the investigation through the established lines of authority at the School. She had a criticism of the Board and went directly to that Board. Further, she went directly to the Executive Secretary upon the recommendation of the Secretary of State, Kathy Karpan.

The Eighth Circuit Court of Appeals, in upholding the right of a police department dispatcher to anonymously report, outside the department's chain-of-command, the perceived misconduct of a police officer, held that "[t]he enforcement of [a chain-of-command] rule against an employee seeking to criticize the very superior empowered to review [the employees' complaints] would impermissibly chill first amendment rights. *Atcherson v. Siebenmann,* 605 F.2d 1058, 1063 n. 5 (8th Cir.1979)." *Brockell v. Norton,* 732 F.2d 664, 668 (8th Cir. 1984). *See also Knapp v. Whitaker,* 757 F.2d 827 (7th Cir.), *cert. denied* 474 U.S. 803, 106 S.Ct. 36, 88 L.Ed.2d 29 (1985) and *Anderson v. Central Point School Dist. No. 6,* 746 F.2d 505 (9th Cir.1984), upholding the lower court's injunction barring enforcement of any policy which prohibits direct communication by teachers on matters of public concern with members of the school board.

In a case where an employee was disciplined for violation of a government department's "chain-of-command" policy by speaking at a public meeting of the county's government board about deficiencies in the department, the Third Circuit Court of Appeals said in *Czurlanis v. Albanese,* 721 F.2d 98, 106 (3d Cir.1983):

A policy which would compel public employees to route complaints about poor departmental practices to the very officials responsible for those practices would impermissibly chill such speech. * * * It would deter "whistle blowing" by public employees on matters of public concern. It would deprive the public in general and its elected officials in particular of important information about the functioning of government departments. We do not read the "efficiency of public services" factor referred to in *Pickering* to extend to a chain-of-command policy as interpreted and applied by the defendants.

See also the post-*Connick* case of *Jurgensen v. Fairfax County, Va.,* 745 F.2d 868 (4th Cir.1984), Butzner, J., dissenting.

Finally, Mekss has the burden of showing that her speech was a substantial or motivating factor in her dismissal by the School to establish a prima facie case. *Doyle,* 429 U.S. at 287, 97 S.Ct. at 576; *Conaway,* 853 F.2d at 795. Once her prima facie case is established, the burden

then shifts to the School to show it was not a motivating factor in the dismissal, that it would have terminated her employment anyway. *Wulf,* 883 F.2d at 857; *Koch,* 847 F.2d at 1440 n. 11. Because both the School and the Personnel Review Board cite the employee's protected conduct as one of the specific acts of insubordination causing her dismissal, it is not necessary to analyze whether either party carried their burden of proof.

Perhaps another motivating factor in Mekss' dismissal was the affect her "insubordination" had on Geisler's ego as illustrated by the incident involving the "letter of apology." In order to resolve their dispute and as an attempt to *impose discipline,* Geisler presented Mekss with three options: resignation, dismissal, or writing a letter of apology. Responsively, she opted to draft the letter of apology. However, Geisler promptly deemed it unacceptable because, although she apologized, she did not recant her earlier criticisms.

Mekss spoke on a matter of public concern. Her First Amendment interests, as a citizen, outweighed any slight impairment in the efficient and harmonious operation of the School. *Pickering,* 391 U.S. 563, 88 S.Ct. 1731. A public employee should have the right to speak on matters of public concern without fear of being discharged. *Connick,* 461 U.S. 138, 103 S.Ct. 1684; *Schalk,* 906 F.2d 491. She was a good employee and the state has an interest in retaining such employees. Competent management should have been able to address her concerns and control any insubordinate behavior without (almost summarily) dismissing her. Under the circumstances of this case, termination was neither fair nor the least restrictive alternative available to the School. The government's violent reaction to employee dissent is clearly not justified in this case.

There is an even more oppressive message of danger for the public employee who is concerned about the services which are being provided by his or her public agency. The concurrence in part and dissent in part in *Leonard v. Converse County School Dist. No. 2,* 788 P.2d 1119 (Wyo.

1990) was emphatically motivated by the same concern for employment if management has an unprincipled right to attack non-conforming performance, *Wulf,* 883 F.2d 842, as "insubordination" or "disloyalty." History leaves no doubt that a singular cause of the destruction of empires and national governments has followed the "three blind mice" syndrome with disregard of the message and execution of the messenger. Equally apparent from this decision, we retell state government employees: "Ignore agency problems or management misconduct since the only one to be fired will probably be you." Compare, however, the current Tenth Circuit Court of Appeals decision in *Considine v. Board of County Com'rs of County of Adams, State of Colo.,* 910 F.2d 695 (10th Cir.1990).

Attacking whistleblowers where a sincere purpose to improve government is the goal by the subterfuge of claimed disharmony or insubordination will inevitably result in bad government and irresponsible management. Like *Leonard,* 788 P.2d 1119 and *Doidge v. State, Bd. of Charities and Reform,* 789 P.2d 880 (Wyo.1990), Urbigkit, J., dissenting, we separate state employees from due process and their constitutional rights, *Schalk,* 906 F.2d 491, since, in the exercise of those rights, we then justify employment termination.

This case again demonstrates the use of the dual foot soldiers of disharmony and non-conformity who then become prison wardens to guard against bothersome conduct or troubling criticism by denying the employee his or her constitutional right to speak out about government and its operation.

Accordingly, I dissent.

### ORDER DENYING PETITION FOR REHEARING

This case came on before the court upon the Petition for Rehearing and Brief in Support of Appellant's Petition for Rehearing filed herein on June 27, 1991 on behalf of Appellant, and the court, having reviewed the file, the record, the opinion of the court, the Petition for Rehearing and

the Brief in Support of Appellant's Petition for Rehearing, and having carefully considered the matters presented therein, finds that the Petition for Rehearing should be denied, and it, therefore, is

ORDERED that the Petition for Rehearing be, and the same hereby is, denied.

URBIGKIT, C.J., and GOLDEN, J., would grant the Petition for Rehearing.